

**U.S. Securities and Exchange Commission**

KAREN MATTESON, Cal. Bar No. 102103
LISA A. GOK, Cal. Bar No. 147660
DAVID VAN HAVERMAAT, Cal. Bar No. 175761
PETER F. DEL GRECO, Cal. Bar No. 164925
Attorneys for Plaintiff

Securities and Exchange Commission
ROSALIND R. TYSON, Cal. Bar No. 85269
  Acting Regional Director
SANDRA J. HARRIS, Cal. Bar No. 134153
  Associate Regional Director, Enforcement
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>       v.<br><br>JOHN C. WILLY, JR.,<br><br>            Defendant. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### JURISDICTION

1. This Court has jurisdiction over this action pursuant to Sections 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(d)(1) & 77v(a), and Sections 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(3)(A), 78u(e) & 78aa.

### SUMMARY

2. This case involves the fraudulent offer and sale of more than $4.5 million in unregistered securities by John C. Willy, Jr. ("Willy"), consisting of interests in a purported overseas trading program paying guaranteed profits of 100% per month. In fact, no such program existed. Instead, the investor monies were wired to the bank account of Temperance Investments, Ltd. ("Temperance") in Gibraltar. Willy used the investor monies to finance his personal living expenses.

3. Willy, by engaging in the conduct described in this Complaint, has violated the securities registration provisions of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) & 77e(c), and the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### THE DEFENDANT

4. John C. Willy, Jr. ("Willy") is a resident of San Bernardino, California. In 1992, Willy pleaded guilty to two counts of grand theft and enhancement. Previously, in 1990, Willy was discharged from a securities brokerage firm for personally receiving fees directly from his clients.

### THE FRAUDULENT SCHEME

**A. Willy Makes Fraudulent Representations To Superior, Inc.**

5. In spring 1999, Willy was introduced to Kim Barrus ("Barrus") and Judy Chacon ("Chacon") at the offices of J.C. Jeffers Company where Willy was then employed, in Redlands, California. Barrus and Chacon were told that J.C. Jeffers Company was in the business of building affordable housing in Third World countries and that it also managed $500 million in investments as a means of raising money for its construction business. Willy represented that any money Barrus and Chacon investedwould be placed in a bank account at National Westminster Bank in Gibraltar, where it would never be commingled with the money of others, and that their money would never leave the account. Instead, their account would be pooled with the accounts of other investors, and European banks would issue a line of credit against the cumulative amount. A European private trust would use those lines of credit - rather than the investors' principal - to buy at a discount "AA" rated corporate and bank debt instruments, which would then be resold. Barrus and Chacon were told by Willy that the trust would earn 10% to 15% per trade.

6. Chacon formed Superior, Inc. ("Superior"), a Bahamian corporation, for the purpose of making various investments. On or about June 10, 1999, based upon Willy's representations and promises of trading program profits, Superior entered into a written Funding Participation Agreement ("Agreement") with Temperance whereby Temperance agreed to provide Superior with access to the "High Yield Investment Program" previously described by Willy, and Superior agreed to place $1 million in that trading program. Willy signed the Agreement on behalf of Temperance.

7. The Agreement states in relevant part:

> (B) [Temperance] is seeking to obtain funds for its humanitarian activities and has access to a High Yield Investment Program . . . into which [Temperance] shall enter on a joint venture basis with [Superior] . . . .
>
> 3. After receipt of [Superior's] deposit . . . [Temperance] undertakes to arrange an "insurance" contract securing [Superior's] deposit. Said "insurance"contract shall contain a "Loan Payor Endorsement" to the benefit of [Superior] for the amount of the deposit. At all times the deposit belongs to [Superior] and [Temperance] is custodian of the deposit and responsible for the safekeeping of the deposit until the deposit is returned to [Superior] . . . .
>
> 4. [P]rofits from the Program [shall be paid] to [Superior] immediately after receipt . . . Said profits are to be 100% of the Program's amount, wired monthly, and shall be paid to [Superior] within twenty-five banking days from the date of the beginning of trading . . . .
>
> 5. Both Parties hereto have agreed to share the profits to [Superior] between [Superior] and [Temperance] on a 90/10 basis . . . .
>
> 7. Should [Superior] make more funds available . . . then such additional funds shall be treated at the same terms and conditions as in this Agreement.

8. On or about June 15, 1999, Superior wired $1 million to the Temperance account at National Westminster Bank in Gibraltar pursuant to Willy's instructions. These monies included monies invested with Superior by investors other than Barrus and Chacon. Superior wired an additional $1.23 million to that account during the next six weeks, consisting of $800,000 wired on June 25, 1999, $130,000 wired on July 9, 1999, and $300,000 wired on July 29, 1999.

9. On or about August 2, 1999, Barrus received a letter on Temperance letterhead purportedly from Willy representing that Superior's initial $1 million deposit had earned the contracted-for $900,000 in profits after the first month of trading and that, pursuant to his request, the total of $1.9 million was being rolled over into another month's trading cycle. In that same letter, Willy acknowledged receipt of the additional three deposits totaling $1.23 million, stated that all of these monies had been placed into the trading program, and set forth the "expected payout" dates for each of the three deposits.

**B. Willy Makes Fraudulent Representations To Amberhill, LLC**

10. Shortly after meeting Willy, Barrus introduced Kaben Starre ("Starre") to Willy at Willy's offices in Redlands. Willy told Starre about the trading program he had previously described to Barrus and Chacon. Willy repeated the assertions he had made to Barrus and Chacon, i.e., that money invested would be placed in its own bank account at National Westminster

Bank in Canada; that Starre would have to accept that the action was used as a basis for a credit line for a trading Trust which loaned money to European banks; that a European trust used those lines of credit, not the investors' principal, to make loans; and that the program generated profits of 100% per month. Willy told Starre that Amberhill, LLC, a Nevada limited liability company controlled by Starre ("Amberhill"), would receive 90% of the profits made on its investments.

11. On or about June 10, 1999, based upon Willy's representations and promises of trading program profits, Amberhill transferred $200,000 to Superior for investment in the trading program described by Willy. These monies included monies invested with Amberhill by investors other than Starre. The Amberhill monies were included in the $1 million invested by Superior on June 15, 1999, pursuant to the Agreement executed bySuperior and Temperance on June 10, 1999.

12. Between July 8, 1999 and August 18, 1999, Amberhill wired an additional $1.3 million in investor monies to the Temperance account at National Westminster Bank for investment in the trading program, consisting of $300,000 wired on July 8, 1999, $120,000 wired on July 20, 1999, $100,000 wired on July 22, 1999, $200,000 wired on August 9, 1999, $500,000 wired on August 12, 1999, and $80,000 wired on August 18,1999. Willy confirmed to Starre that he had received $1.5 million from Amberhill, and periodically told Starre what profits Amberhill's investments had purportedly generated.

13. On or about October 1, 1999, Amberhill wired an additional $1 million to the Temperance account at National Westminster Bank. This final wire brought Amberhill's total investment in Temperance to $2.5 million, $200,000 of which had been invested through Superior.

**C. Willy Misappropriates And Misuses Investor Funds**

14. The "High Yield Investment Program" described by Willy does not exist and never has existed. Contrary to Willy's representations that the monies invested by Superior and Amberhill would be held in separate accounts from which they would never be withdrawn, these monies were deposited into the same Temperance account at National Westminster Bank and commingled with the monies of others. At least $1 million of the monies in the Temperance account were subsequently transferred on Willy's instructions to a Temperance account at ABN Amro Bank in Switzerland, and another $2.4 million was transferred to a Temperance account at First Montauk Securities Corporation in the United States controlled by Willy.

15. In addition, undisclosed to either Superior or Amberhill, at least $815,000 of the commingled funds held by Temperance was transferredfrom the above Temperance accounts to Capital Management Services, Inc., a Nevada corporation ("Capital Management"), after the initial investment of Superior and Amberhill monies on June 15, 1999. Willy is the sole owner, officer and employee of Capital Management and the sole signatory to the bank account to which the monies were transferred from Temperance.

16. Willy used monies he caused to be transferred to Capital Management to pay for, among other things, home furnishings, art, remodeling his home, landscaping, cars, credit card bills, gifts to his children, unsecured (and never repaid) loans to friends and former girlfriends, and escrow costs on beachfront property in Hawaii that he ultimately never purchased.

17. On December 21, 1999, pursuant to Superior's demand to Willy, Temperance returned $2.1 million to Superior.

18. On November 19, 1999, January 11, 2000, and March 9, 2000, purported "profits" of $90,000, $45,000 and $70,000, respectively, were wired from Temperance to Amberhill. In or about April of 2000, Amberhill demanded return of its entire investment with Temperance, together with all previously represented profits. None of those monies have been returned.

**FIRST CLAIM FOR RELIEF
OFFER AND SALE OF UNREGISTERED SECURITIES**

**Violations of Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. §§ 77e(a) & 77e(c)]**

19. Paragraphs 1 though 18 are realleged and incorporated herein by reference.

20. Defendant Willy, by engaging in the conduct described above, directly or indirectly:

a. used or caused to be used the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of prospectus or otherwise;

b. carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale; or

c. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, securities.

21. No registration statement has been filed with the Commission or has been in effect with respect to these securities.

22. By reason of the foregoing, defendant Willy violated, and unless restrained and enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act.

### SECOND CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
### Violation of Section 17(a) of the Securities Act
### [15 U.S.C. § 77q(a)]

23. Paragraphs 1 though 18 are realleged and incorporated herein by reference.

24. Defendant Willy, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a. with scienter, employed devices, schemes or artifices to defraud;

b. obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities;

in violation of Section 17(a) of the Securities Act.

25. By reason of the foregoing, Willy violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act.

### THIRD CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE
### PURCHASE OR SALE OF SECURITIES
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 thereunder
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5]

26. Paragraphs 1 through 18 are realleged and incorporated herein by reference.

27. Defendant Willy, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

a. employed devices, schemes or artifices to defraud;

b. made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon otherpersons;

in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Issue findings of fact and conclusions of law that Defendant committed the alleged violations.

## II.

Enter in a form consistent with Fed. R. Civ. P. 65 an order permanently enjoining the Defendant and his agents, servants, employees and attorneys, and all persons in active concert or participation with him who receive actual notice of the order by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## III.

Enter an order that the Defendant disgorge all profits gained directly or indirectly from his illegal conduct, together with prejudgment interest thereon.

## IV.

Enter an order that the Defendant pay a civil penalty pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or toentertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: December 4, 2001  _____
Peter F. Del Greco
Attorney for Plaintiff
Securities and Exchange Commission

*http://www.sec.gov/litigation/complaints/complr17256.htm*

Home | Previous Page        Modified: 12/05/2001