# EXHIBIT B



95

1    moving forward with a foreclosure notice.

2        Q.    Have you been provided notice of that foreclosure

3    or that intent to foreclose?

4        A.    **We got a notice of intent, I believe.**

5        Q.    And who sent that to you?

6        A.    **That would be Dr. Kim.**

7        Q.    Directly?

8        A.    **Yes, directly.**

9        Q.    Not through counsel?

10       A.    **Not through counsel.**

11       Q.    And for the record, Kennedy Funding has been made

12   apprised of all the encumbrances on that property thus far.

13   Correct?

14       A.    **Yes.  That's correct.  It's our understanding that**

15   **all of those encumbrances will be paid off at closing.**

16       Q.    Do you personally earn any income from any

17   non-Stavatti entities?

18       A.    **I do.**

19       Q.    And what is it that you do to earn income?

20       A.    **Well, I have a partnership with a company owned by**

21   **a friend of mine, David Wilcock, and we did different video**

22   **presentations.**

23       Q.    And is that the same David Wilcock who is a

24   shareholder in Stavatti?

25       A.    **Yes, that is correct.**

112

1  Commission?

2      A.    No.

3      Q.    And are you?

4      A.    No.

5      Q.    Is it your contention that you did not sign the

6  promissory note?

7      **A.    I didn't sign it, no.  That's correct.  I did not**

8  **sign the exact note.  What would usually happen, like in**

9  **the case of any investment document that Stavatti does, how**

10  **I like to see it happen and how the procedure is, is I get**

11  **an idea of what kind of relationship we'll have.  We put**

12  **the terms together on a piece of paper that I create.  It**

13  **is then issued to the party.  They execute the agreement,**

14  **and then I will sign it.  And depending on what the deal**

15  **is, we may have that notarized.**

16      Q.    And then how long after that -- those funds hit

17  your account did you contact the bank to let them know it

18  was erroneous?

19      **A.    We did not contact the bank to let them know it**

20  **was erroneous.  We accepted it as an investment.**

21      Q.    Absent, according to your contention, a signed

22  document from you?

23      **A.    Correct.**

24      Q.    And do you just -- is it standard process at

25  Stavatti to accept gratuitous investments?

154

1    Q.    In a succinct fashion, what efforts, if any, did

2  Stavatti make to repay the Plaintiff's loan?

3    A.    The big effort is to complete the fundraising

4  through DelMorgan.  The intent, of course, was to raise

5  $35 million through DelMorgan.  And once that funding has

6  been raised, to repay all debts.  And then move forward

7  with our business plans.

8            Due to DelMorgan's inability to secure the

9  funding for us, we began a process in February of 2023 and

10  even prior to that.  Part of the issue -- and I'll try to

11  be succinct -- the DelMorgan agreement had an element of

12  exclusivity in it.  So in order to raise additional

13  capital, we had to navigate that in a very cautious manner

14  if they were not performing.

15            We believed that DelMorgan having completed

16  their fundraising documents, such as their pitch deck and

17  their teaser in June of 2022, that they were actually

18  actively fundraising for us.  They should have been able to

19  fundraise, and this entire matter should have been resolved

20  with respect to fundraising within six months.

21            Unfortunately, they didn't do that.  They

22  were unable to fundraise for whatever reason.  We changed

23  gears with DelMorgan in December of 2022, informing them:

24  Since you're unable to raise funding for military projects,

25  let's switch gears to a nonmilitary project.  And our



161

1      "Yes.  The one million loan provided by

2      Mr. Dimitrov as an angel investor lender was

3      received on 1 March, 2022, by Stavatti to

4      serve as seed capital for the purpose of

5      paying initial fees associated with DelMorgan

6      & Co, DelMorgan, investment banking firm

7      engaged by Stavatti."

8      Q.    Thank you.

9            We previously discussed bank accounts.

10     A.    Uh-huh.

11     Q.    And per your description, the primary account, as

12     you called it, is the account ending in 7316.  Correct?

13     A.    Correct.

14     Q.    And that's a bank account with Bank of America.

15     Is that correct?

16     A.    That's correct.

17     Q.    And would you say that you reasonably monitor that

18     account in your position as --

19     A.    I do.

20     Q.    Thank you.

21            And are you aware that on March 1st of 2022,

22     that that account received a counter credit of $912,500?

23     A.    Yes.

24     Q.    Are you also aware that on -- to that same

25     account, on April 20th of 2022, the company received an

163

```
 1   that preceded the lawsuit?
 2       A.   Yeah.  Yeah.  The only -- the only point of
 3   contact that Stavatti had with Valentino Dimitrov that I
 4   was in communication or anyone else did was Brian Colvin.
 5       Q.   So am I correct in saying that before today, you
 6   had never even spoken to him?
 7       A.   I had not spoken with him.  Didn't know who he
 8   was.
 9       Q.   You had only engaged with him through his counsel
10   that being --
11       A.   That being you.
12       Q.   Correct.
13       A.   Didn't have his phone number.  As a matter of
14   fact, I don't think I got his phone number until
15   Brian Colvin surrendered the promissory note that -- under
16   Bonadio's request to do an audited financial statement.
17       Q.   Which had it on it?
18       A.   Which had it on it, correct.
19       Q.   Once the funds were received, other than the
20   remittance to DelMorgan, which you expressed was the need
21   for those funds -- for those funds in your letter --
22       A.   Uh-huh.
23       Q.   -- what else was the money used for?
24       A.   To pay off some of these debts associated with
25   9400 Porter Road.  We used it to engage the services of
```



**Griffin Group International**
**888.529.9990 | 602.264.2230**

164

1    **T3 Enterprises, general business operating expenses**

2    **associated with that.**

3           I think at some point I provided a list.  I

4    mean, it's within that -- our bank statement reflects where

5    money went in that time period.  So...

6        Q.    Sure.  And you can confirm that John Simon has

7    signature authority over the Stavatti Niagara account.

8    Correct?

9        A.    Correct.  And so a certain portion of funds would

10   be transferred to that, and they would be spent on the

11   expenses associated with 9400 Porter Road.

12       Q.    Does anybody other than yourself have signature

13   authority over that -- over the primary account, the 7316

14   account?

15       A.    No.

16       Q.    Does that include your wife?

17       A.    She has no signatory authority over any Stavatti

18   accounts.

19       Q.    In reviewing the cap table, a particular

20   shareholder was of interest just given the amount of equity

21   he purportedly has, that being David Wilcock.

22       A.    Uh-huh.

23       Q.    How does Mr. Wilcock acquire that many shares in

24   Stavatti Enterprises?

25       A.    David was one of our founding shareholders.  David

**Dimitrov vs**                                              **Christopher R. Beskar**
**Stavatti Aerospace**

171

1      A.    Is it irrelevant?

2      Q.    It's not that it's irrelevant.  It's not in

3   response to my question.  Ask me a question, I'd be happy

4   to respond to it.  I can't comment on as to whether I saw

5   that letter from the Ukrainian.

6      A.    We can provide it.  But we have a lot of stuff

7   like that.

8      Q.    What was your understanding of the purpose of the

9   Plaintiff's investment?

10     A.    The purpose of the Plaintiff's investment was to

11   raise $100,000 to pay DelMorgan their initial up-front fee

12   of $100,000 so that they can then be engaged and write the

13   private placement memorandum and go forth and raise the

14   money we need to build the prototype of the MiG to get the

15   Ukrainian contract to go for it and build upgraded MiGs,

16   and then we'll be happily ever after.

17     Q.    So is it fair to say that at the time you believed

18   that Stavatti would be able to repay the Plaintiff's loan

19   according to his terms --

20     A.    Oh, yes.

21     Q.    -- given the impending financing?

22     A.    Yeah, we were -- we were of the understanding that

23   DelMorgan being a professional banking firm would have this

24   done in a jiffy, that they -- within 30 days, they'd crank

25   out the documentation needed, and that they had a network

173

1   like here.  Take it.  Stamp your name on it.  Go raise

2   money.  What's the problem?

3                So that was my whole attitude.  And the

4   reason we were engaging them is because they were a

5   professional FINRA registered investment banking firm with

6   a network.  And that it's -- you know, it's not just me out

7   there trying to raise money.  It's a -- you know, here you

8   go.

9       Q.    But the funds were being raised for working

10  capital, as you say, and additionally to pay off existing

11  debts?

12      A.    Well, the initial purpose was, I mean, just raise

13  $100,000.  If we raise more than that, then it will go to

14  business expenses.  But the goal was not necessarily to

15  raise millions of dollars.  The goal was:  Let's raise

16  $100,000.  Make sure DelMorgan is funded and, you know,

17  raise extra if you can, because the DelMorgan may have --

18  it may be additional fees.  They may ask me to go travel

19  to, you know, who knows.  Could travel to Paris for all I

20  know to try to raise money, because the French are so happy

21  to support Ukraine.

22                So we were -- of course, we had other

23  operating expenses.  But from our perspective, we expected

24  within six months of the engagement that we'd be

25  capitalized at $30 million.  Any debt would be repaid, and



Dimitrov vs                                                      Christopher R. Beskar
Stavatti Aerospace

                                                                              174

1    we'd be off to the races.

2       Q.    Thank you.

3             Are you aware of the pitch deck that was

4    created titled "Stavatti Aerospace 2 Billion Pitch Deck"?

5       A.    Yes.  I believe I created it, yes.

6       Q.    You created it?

7       A.    Yes.

8       Q.    And within it -- obviously it's intended to be

9    enticing to potential investors or noteholders.  It says in

10   there -- and I think you can acknowledge it -- that there's

11   a $2 billion investment opportunity.  Correct?

12      A.    Correct.  Yes.

13      Q.    That's something you authored?

14      A.    Correct.

15            MR. DUNMIRE:  What date was that one?

16            MR. CHEBAT:  A date on this document is

17   June 2022, and the cage code of the company is found on

18   there.  The DUNS number is found on there.  And there's a

19   copyright rights reservation as of 2022 for Stavatti

20   Aerospace.

21   BY MR. CHEBAT:

22      Q.    And you acknowledge it's a document?

23      A.    Yes.  It's one of our many pitch decks that we've

24   been creating.

25      Q.    Excellent.  And here in this document you have a

183

1   considered an executed promissory note?

2       A.    They were not executed by me.

3       Q.    Or authorized by you?

4       A.    Or authorized by me.

5       Q.    Okay.  So if you said, yes, they were executed,

6   that was misspeaking?

7       A.    They were -- it was misspeaking on my part as far

8   as did I -- did I personally execute them and did I

9   personally approve them and were they accepted to the

10  board.

11              Now, am I -- we've accepted the money.  We

12  received the money.  We acknowledge that these people

13  invested in Stavatti.  So our purpose is to make those

14  people whole.

15      Q.    Okay.  Thank you.

16              Did -- and a little repetitive, I suppose.

17              Did you ever authorize Brian to use a

18  facsimile signature bearing your name on promissory notes

19  to be filled out by Brian?

20      A.    No.

21      Q.    You know, this February 15th e-mail that just

22  came, I first saw it this morning, and you read it into the

23  record.

24      A.    Uh-huh.

25      Q.    We heard your testimony about that.  You were very



**Griffin Group International**
**888.529.9990 | 602.264.2230**

**Dimitrov vs**                                                     **Christopher R. Beskar**
**Stavatti Aerospace**

186

1    he was not president.  Correct?

2        A.    No, he wasn't.  And even -- I think I had sent you

3    a copy which was uploaded to the disclosures of a draft

4    investment agreement.  I believe it was maybe January 10th

5    or some date, February 10th, perhaps.  It was a draft term

6    sheet for a proposed $2-1/2 million funding.  It mentions

7    the Super Fulcrum project.  It mentions potential terms,

8    and it has my name on it, Brian as a vice president, and

9    then Valentino Dimitrov.

10                  And it was my understanding that this is

11   going to be an initial template, icebreaking document that

12   could then be used to develop some formal agreement.  So

13   that was, you know, really the last I heard of the Dimitrov

14   investment up until it happened.

15                  And so it was, you know, kind of a

16   bait-and-switch operation as far as I was concerned.  We

17   give him one document that I said, okay, this is the

18   structure that could work, but here are the parties.  And

19   so he was clearly represented as a vice president on that

20   document.

21                  MR. DUNMIRE:  Could we go off record for a

22   moment.

23                  MR. CHEBAT:  Yes.

24                  (Discussion off the record.)

25                  MR. DUNMIRE:  I -- I don't think I have