# EXHIBIT 68-3



IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF ARIZONA

Valentino Dimitrov,                )
individually and on behalf of      )
all others similarly situated,     ) No.
                                   ) 2:23-CV-00226-PHX-DJH
                Plaintiff,         )
                                   )
        vs.                        )
                                   )      DEPOSITION OF
Stavatti Aerospace, Ltd, a         )
Minnesota corporation;             )   CHRISTOPHER R. BESKAR
Stavatti Aerospace, Ltd, a         )
Wyoming corporation; Stavatti      )
Corporation, a Minnesota           )
corporation; Stavatti              )
Immobiliare, Ltd, a Wyoming        )
corporation; Stavatti              )
Industries, Ltd, a Wyoming         )      Phoenix, Arizona
corporation; Stavatti Niagra,      )      January 24, 2025
Ltd, a New York corporation;       )        11:09 a.m.
Stavatti Super Fulcrum, Ltd, a     )
Wyoming corporation; Stavatti      )
Ukraine, a Ukrainian business      )
entity; Stavatti Heavy             )
Industries, Ltd, a Hawaii          ) REPORTED BY:
corporation; Christopher           ) PAMELA A. GRIFFIN, RPR,
Beskar and Maja Beskar,            ) CRR, CRC
husband and wife; Brian Colvin     ) Certified Reporter
and Corrina Colvin, husband        ) Certificate No. 50010
and wife; John Simon and Jean      )
Simon, husband and wife;           ) PREPARED FOR:
William Mcewen and Patricia        ) CONDENSED/ASCII
Mcewen, husband and wife; Rudy     )
Chacon and Jane Doe Chacon,        ) (Certified Copy)
husband and wife; and Does 1       )
through 10, inclusive,             )
                                   )
                Defendants.        )
                                   )



**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

21

1    Industries in California to operate the business as a

2    foreign company.  We dissolved that.  That's when we were

3    doing the primary work with Hybrid Technology in

4    California.  And then we also had foreign business entity

5    licensing in Nevada for about a year.  So we also

6    terminated that.

7        Q.    Okay.  So just starting with Stavatti Aerospace,

8    Limited, what do you guys do there?

9        A.    Well, that's the primary Stavatti company right

10   now.  It's our main focus of attention.  The rest of the

11   corporate entities are, for the most part, not dormant, but

12   they're inactive.  You know, they're still in existence.

13              What we've done is we -- we've received

14   licenses from both myself and all the other companies that

15   have any intellectual property under the Stavatti name

16   related to airplanes.  We focus on the design and eventual

17   production of new airplanes.

18              Stavatti Aerospace is focused on -- on -- on

19   really civil and military aircraft design and production.

20   We're pursuing the development of new airplanes either as a

21   contract basis or as a direct commercial private sector

22   operation.

23              We -- our -- our -- our ultimate goal is to

24   mass produce commercial and military aircraft.  And so

25   that's basically what we do.  There's other components of



23

1    MiG upgrade.

2              Another thing Stavatti has focused on for

3    some time is the proposed upgrade of military aircraft,

4    including MiG 29s for allied countries that still fly them

5    and Su-27 Flankers for the same.

6              Basically one of the challenges in the

7    aerospace industry is we have a lot of former Soviet

8    equipment that entered NATO hands.  And the question is:

9    Do air forces wish to keep flying those planes?  And one of

10   the big challenges with that is getting parts from Russia.

11   And the way things are today, a lot of the supply chains

12   were cut off.  So it became a very useful business model.

13             But even before then, you know, there had

14   been deficits in engines, avionics, things.  If you have a

15   Russian MiG 29, how do you fly it with NATO aircraft and

16   operate with NATO systems?  So that's been a focus for us

17   as well.

18             So you can say we're in the new design --

19   business of new design airplanes.  We're in the business of

20   upgrading airplanes.  We're in the business of fixing

21   airplanes.  So that's what we're doing and what we're

22   building.

23   Q.   Have you ever produced an aircraft?

24   A.   Okay.  So Stavatti Aerospace, Limited, formed in

25   2019 has not produced any airplanes.  In order to do that,

37

1   he doesn't really have much of a role.  But as soon as we

2   do, he'll be coming on board in that capacity developing

3   our flight test program.

4       Q.   Going to Stavatti Corporation, what does that

5   entity do?

6       A.   Right now -- you know, Stavatti Corporation used

7   to be our core business.  It was what Stavatti Aerospace

8   was in the beginning.  And so they were -- you know, the

9   mission was develop and produce airplanes.

10              Currently, Stavatti Corporation owns the

11   intellectual property rights to three airplanes.  And so

12   what Stavatti Corporation has become now is really just a

13   royalty rights holder.  And so if Stavatti Aerospace, which

14   has a license from Stavatti Corporation, produces either

15   our Stalma design or the Machete design or the sleek

16   design, royalties will be paid from those designs to

17   Stavatti Corporation for distribution to the shareholders.

18              So you could view it as kind of a shareholder

19   passthrough company.  So it exists -- you know, we don't

20   want to dissolve it because it has shareholders.  And the

21   shareholders of that company, some of whom are shareholders

22   of Stavatti Aerospace, but there are some who are not.  And

23   so those were the -- some of the original investors.  I

24   believe there's 32 shareholders or something along those

25   lines.  Maybe 55.  I apologize.  But say there are under 60

38

1    shareholders for Stavatti Corporation.

2              If any -- like I said, if any revenues are

3    generated and a royalty is paid from specific airplane

4    projects, then they will receive that.  So at that time,

5    Stavatti Corporation will be making some money to pay out

6    shareholders.

7         Q.   Does Stavatti Corporation have a board of

8    directors?

9         A.   It does.  It's -- it -- right now it's basically

10   myself.  The directors of Stavatti are focused on Stavatti

11   Aerospace.  We have a joint meeting for, like, a joint

12   shareholders meeting annually whereby the shareholders of

13   Stavatti Corporation and Stavatti Aerospace will

14   participate in one meeting, so everyone will get updated

15   with what the news is.

16        Q.   Does Stavatti Corporation have any other

17   executives?

18        A.   Other than myself, no, at this time.

19        Q.   So only you oversee Stavatti Corporation?

20        A.   Correct.

21        Q.   Does it have any employees?

22        A.   No.  Just myself in the capacity of CEO.

23        Q.   Any contractors?

24        A.   No.

25        Q.   Stavatti Immobiliare?



**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

39

1       A.    Yes.

2       Q.    Is that how you say it?

3             What does that entity currently do?

4       A.    That entity, we created that as a real estate

5    management company.  For instance, in this recent Kennedy

6    loan, the president of Kennedy, Kevin Wolfer, said, "If you

7    have a holding company to put the property in, I would

8    advise you do that."

9             And the response was, "Well, we do have a

10   holding company to put properties into if it's desired to

11   that."  It's Stavatti Immobiliare.  It was created as a

12   real estate holding company.

13            The original intent of that was:  If we

14   acquire other large facilities -- for instance, we're in

15   the process of hopefully purchasing the former Bell

16   Aerospace plant, which is a large 1.7 million square foot

17   aircraft factory in Niagara Falls.  We put a $500,000

18   deposit on that.

19            Well, if we acquire that facility, we may

20   want to move it into a real estate holding company.  So we

21   created Stavatti Immobiliare in the event we were to do

22   that kind of transaction.  So it's a place -- it's a

23   company.  It's active.  It's registered.

24            But it doesn't do anything at the moment.  It

25   doesn't have a bank account.  It doesn't own any property.



**Dimitrov vs**                                                    Christopher R. Beskar
**Stavatti Aerospace**

40

1    And it would be a subsidiary in the sense that it's owned

2    in part by Stavatti Aerospace.  So at the moment, it's just

3    a wholly owned subsidiary of Stavatti Aerospace, Limited.

4         Q.    Does Stavatti Corporation have a bank account?

5         A.    Not at this time.

6         Q.    Has it ever had a bank account?

7         A.    It has, yeah.

8         Q.    With what financial institution?

9         A.    The first financial institution was Vermillion

10   State Bank of Minnesota, and then it shifted to U.S. Bank.

11   And then we closed the U.S. Bank account for Stavatti

12   Corporation, I think, in about 2016, let's say.  Maybe

13   2018.  Something along there.

14        Q.    Does Stavatti Corporation have any corporate

15   credit cards?

16        A.    No.

17        Q.    Does Stavatti Immobiliare have any corporate

18   credit cards?

19        A.    No.

20        Q.    Have they ever had any corporate credit cards?

21        A.    No.

22        Q.    Does Stavatti Immobiliare have any employees?

23        A.    No.  Just myself as the CEO.  That's correct.

24        Q.    Are there any other executives or board of

25   director members?



41

1      A.    No.

2            MR. CHEBAT:   Let the record reflect the time

3      is now 12:00 p.m., and despite the message received from

4      counsel to Brian Colvin, Counsel Nino Abate is still not

5      present at the deposition.

6      BY MS. SILVA:

7      Q.    So Stavatti Industries, what do they currently do?

8      A.    Okay.  Not very much.  Stavatti Industries --

9      well, so that's -- I'd say that's the home for our engine

10     division.  I mean, but most of that work is actually being

11     done by Stavatti Aerospace.  So it's sort of a placeholder.

12           Stavatti Industries was very focused on

13     cementing heads and oil tools and non-airplane related

14     business enterprises.

15           We are no longer focused on that at the

16     moment.  All of that machining work has really shifted to

17     Stavatti Aerospace.  Stavatti Industries was created -- I

18     think it was like the third Stavatti company we formed

19     during the days of Stavatti Corporation.  So the focus of

20     that was to really concentrate on the non-airplane

21     business.

22           It does to a degree still maintain activities

23     with respect to the engines in name because it owns the

24     NeoThrust trademark.  But as far as the future of that,

25     whether that will actually be an active business enterprise

42

1  that's manufacturing jet engines or that will all be done

2  under Stavatti Aerospace, we're not certain.

3            We stopped having it be a very active company

4  when we terminated the California foreign business

5  activities, mainly because what happened was we formed

6  Stavatti Aerospace.  We acquired our 9400 Porter Road

7  location, and we shifted effectively out of California.

8  And while I still live in California, our center of

9  operations really became Niagara Falls from a business

10  perspective.  So Stavatti Industries just was no longer

11  really a focus, and, you know, we decided to bring

12  everything in house.

13     Q.   Does Stavatti Industries have a board of

14  directors?

15     A.   They did.  They don't currently.  It's -- it's

16  just myself again.  We've shifted that.  And -- and what

17  you could say about, and generally speaking, with all of

18  the Stavatti business activities, we shifted basically

19  everything that was in Stavatti Corporation or Stavatti

20  Industries or any of these other entities.  We moved it all

21  into Stavatti Aerospace.  So Stavatti Aerospace of Wyoming,

22  formed in 2019, is really our core business that we

23  concentrate on.

24            Everything else is -- is either a generally

25  inactive or dormant business, or it was set up for a

**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

43

1   specific purpose like real estate holding.  Or we may form

2   a company to create to manage a specific project.

3        Q.   Does Stavatti Industries have any bank accounts

4   currently opened?

5        A.   No, I don't believe they have at this time.  No.

6        Q.   Did they in the past?

7        A.   In the past they had a U.S. Bank account with U.S.

8   Bank.

9        Q.   Did Stavatti Industries ever have a corporate

10  credit card account with anyone?

11       A.   We had a corporate debit card tied to a bank

12  account, but, no, I don't think they ever had a credit

13  card.

14       Q.   Do you know what financial institution that was

15  with?

16       A.   That would be U.S. Bank.  Oh, we may have had a --

17  we might have had one corporate credit card.  That was -- I

18  think that was also a U.S. Bank credit card.

19       Q.   Does Stavatti Industries have any employees or

20  contractors?

21       A.   Not at this time.  Just myself as the CEO.

22       Q.   At Stavatti Niagara, are there any board of

23  directors?

24       A.   Stavatti Niagara would be -- no, I don't think

25  there's a board of directors.  I know John Simon is the



44

1    president and CEO.  I guess you could say that I'm -- I'm

2    on the board of directors, just per statute.  I mean, in

3    that sense.

4              But it's a -- it's a wholly owned subsidiary

5    of Stavatti Aerospace.

6    Q.   Are there any other executives besides yourself?

7    A.   Well, John Simon, yeah.

8    Q.   Does Stavatti Niagara have any bank accounts?

9    A.   Stavatti Niagara -- what we have for that whole

10   institution -- so Stavatti Aerospace has a bank account

11   with Bank of America.  In that bank account, we have three

12   segmented accounts.  There's the primary, the 7316 account,

13   which is our master bank account.  Then we have two other

14   bank accounts that are focused on Stavatti Niagara in the

15   sense that they're used to manage the expense associated

16   with 9400 Porter Road.

17             And so there's effectively two other bank

18   accounts that we use for Porter Road, and those are the

19   bank accounts that John Simon has access to as president

20   and CEO of Stavatti Niagara.

21             So they don't really have a bank account of

22   their own.  It's not -- I don't believe it's under their

23   corporate name or their registration or their EIN.  It's

24   under Stavatti Aerospace.  But there is an account that

25   specifically addresses the money that's spent on 9400

**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

47

1   actually receive a contract.  These have been going on for

2   many years.  They've certainly increased recently, and

3   there's more -- more interest in it than ever before.  We

4   have documentation of this and letters of intent.

5            If that contract is awarded, in all

6   likelihood, that contract -- that project will be put into

7   that organization.  So that organization will be managing

8   that program in joint venture with Stavatti Aerospace.

9            So one of the general thoughts in the whole

10  process is that if we're offering investors the opportunity

11  to buy into, to own shares in a particular project, or to

12  receive a royalty or something like that in the MiG-29

13  project, they would be part owners of the MiG-29 company,

14  the Super Fulcrum entity.  And Stavatti Aerospace would be

15  the dominant owner.  They own 50 percent of the equity or

16  55, or whatever it happens to be.

17       Q.   Does Stavatti Ukraine have a board of directors?

18       A.   It does.

19       Q.   Who is on that board of directors?

20       A.   Well, myself, Dimitriy, Michael Michaela, Serghei.

21  I think that is it.

22       Q.   What is the purpose of Stavatti Ukraine?

23       A.   Stavatti Ukraine was formed under the laws of

24  Ukraine.  I believe it was in November of 2017 for the

25  purpose of doing business in Ukraine.



48

1          In order for a defense company or really, I

2   guess, any company to do business in Ukraine with the

3   Ukrainian government, you needed to form a Ukrainian

4   entity, and it has to be owned in part by Ukrainian

5   citizens.  It needs to be domiciled in Ukraine.  And so

6   the -- at least that was our understanding.

7          So the people that actually wanted to work

8   with the Ukrainian Air Force, we formed this company in

9   Vinnytsia, which is the home of the Ukrainian Air Force.

10  That's where they're headquartered.  And it was created

11  specifically to -- to manage that business.

12         And so we have a small office in Vinnytsia.

13  We have a people there on staff.  They actually do quite a

14  bit of business.  They -- they are pretty autonomous.  And

15  they don't really send money back to us.  Stavatti

16  Aerospace has invested in them.

17         But they actually generate a local business.

18  They got into the construction of defense.  They built an

19  underground bunker for communications during the war.  They

20  raised local money to do that.  It was pretty -- pretty

21  neat how they did that.

22         They've been coordinating anti-drone systems.

23  We've coordinated the sale of anti-drone technology that

24  has been deployed.  And they've been doing everything they

25  can to secure contracts for aircraft for other projects,

49

```
 1    for artillery shells, whatever.  You know, they've been

 2    kind of a service company.

 3              So it's -- it's been an active business in

 4    that sense.  I don't have the payroll documentation, all

 5    that on my person, but, you know, Dimitriy, who now lives

 6    in America, he was in Ukraine at the time.  He's here.

 7    Serghei remains in Ukraine.  He's managing it.  He has his

 8    staff.

 9              So they're -- they're active.  And of course,

10    they're very excited about the MiG upgrade contract.  We've

11    had many proposals to them and to NATO regarding F-16

12    upgrades and things.  And so it's a pretty active business.

13    It's not making tremendous amounts of money.  But from a

14    Ukraine standpoint, it's certainly been helpful.

15        Q.   So Stavatti Ukraine does have employees?

16        A.   I'd say they do.  I'd say they probably have,

17    like, between five and ten.  Maybe at most they might have

18    25 people working on the construction projects.

19        Q.   Does Stavatti Ukraine have any bank accounts?

20        A.   They do have a bank account, yeah.

21        Q.   What institution is that with?

22        A.   Don't know the name of it exactly off the top of

23    my head, but it is a Ukrainian bank.  So...

24        Q.   Does Stavatti Heavy Industries have a board of

25    directors?
```



61

1    A.    Yeah, I would say so.  Yeah.

2    Q.    Yeah?  How do they support their payroll?

3    A.    That was for the construction project with the

4    bunker and other construction projects they did in the

5    past.  So they were building some military -- I think they

6    built some military barracks.  They were doing different

7    things at the Vinnitsa and other air bases.  So those were

8    contracts they would receive from the Ukrainian Air Force

9    or the Ukrainian government to do construction projects.

10   And so they would hire -- they served as kind of the

11   contractor responsible for that.  So they'd hire the people

12   to do the work, and they'd pay the -- pay the payroll that

13   way.  So that was a project-by-project basis.

14   Q.    Has Stavatti Aerospace ever provided funds to

15   Stavatti Ukraine?

16   A.    Yes, we have.  We've invested in Stavatti Ukraine.

17   Q.    What were those investments for?

18   A.    Predominately business operations, travel expenses

19   for trips back and forth to Kiev, marketing, government

20   relations, that sort of thing.  So mostly just keeping --

21   keeping the business operating.

22   Q.    Where did those funds come from?

23   A.    From our shareholders, from our investors.

24   Q.    How much funds has Stavatti Aerospace provided to

25   Stavatti Ukraine?



62

1      A.    I'm not certain of the exact number, but it's

2   probably on the order of $250,000.

3            Part of that went into, as I mentioned, we

4   put a deposit down on some land that we were buying at the

5   Vinnytsia airport.  I think that's part of the -- would be

6   included in there.  So we may have -- may have put in

7   between 200- and $300,000.

8      Q.    Going back to Stavatti Heavy Industries and

9   Stavatti Industries, can you provide a distinction between

10  the two for us?

11     A.    Sure.  Well, Stavatti Heavy Industries was the

12  first one we formed.  That was in Hawaii.  We -- that

13  really didn't do any business, so to speak.

14            Stavatti Industries was formed more

15  specifically to conduct the oil cementing tool business.

16  And when we organized that as a Wyoming company rather than

17  a Hawaii company, anything that was really under the focus

18  or purview of Stavatti Heavy Industries just became the new

19  Stavatti Industries.  So you could say that everything we

20  were doing kind of merged into Industries from Heavy

21  Industries, and Heavy Industries, it exists as a dormant

22  company, or as a company, but it's not -- you know, it's

23  not very active, just a Hawaii company.

24            You know, there's been an idea that someday,

25  if we ever want to set up an office in Hawaii, we might as

**Dimitrov vs**                                                    Christopher R. Beskar
**Stavatti Aerospace**

70

1    revenue.  There's the revenue that is public revenue and

2    revenue that you cannot disclose because you're under

3    contract not to talk about your revenue.  The revenue that

4    we have disclosed is -- oh, I'm not even certain of the

5    number.  I'd say half a million dollars a year at times.

6    Maybe less.

7        Q.   I know you mentioned some things you cannot

8    disclose, obviously, that confidential contract with some

9    intelligence agency.

10            If we were to get a protective order with the

11   court, would you be able to share that information with us?

12       A.   Sure.

13       Q.   Has Stavatti Immobiliare ever generated revenue?

14       A.   No.

15       Q.   Has Stavatti Heavy Industries ever generated

16   revenue?

17       A.   No.

18       Q.   Has Stavatti Industries ever generated revenue?

19       A.   Yes.

20       Q.   How much revenue?

21       A.   I'm not certain of the number.  Probably $200,000,

22   something like that.

23       Q.   Has Stavatti Niagara ever generated revenue?

24       A.   No.

25            MR. DUNMIRE:  Other than what he already

71

1    testified to.

2    BY MS. SILVA:

3        Q.    Has Stavatti Europe ever generated revenue?

4        **A.    No.**

5        Q.    Before being dissolved, had Stavatti Korea ever

6    generated revenue?

7        **A.    No.**

8        Q.    Has Stavatti Canada ever generated revenue?

9        **A.    No.**

10       Q.    To your knowledge, did Stavatti UAVS ever generate

11   revenue?

12       **A.    No.**

13       Q.    Has Stavatti International ever generated revenue?

14       **A.    No.**

15       Q.    With the exception of Stavatti Corporation's

16   royalty rates and property owned by Stavatti Niagara, do

17   any other Stavatti entities have assets?

18       **A.    The primary asset holder is Stavatti Aerospace.**

19   **I'd say no, other than maybe office furnishings and**

20   **equipment.  So the only companies in Stavatti, in the**

21   **Stavatti Enterprises that have assets, are probably**

22   **Stavatti Ukraine and Stavatti Aerospace of Wyoming.**

23              MR. DUNMIRE:  Are you excluding

24   intellectual-type property?

25              **THE WITNESS:  Well, she said before was**

72

1    Stavatti Corporation.

2    BY MS. SILVA:

3        Q.    What assets besides the property does Stavatti

4    Aerospace have?

5        A.    Well, there's the intellectual property assets and

6    any -- any physical equipment that's in the -- in the

7    facilities.   John Deere tractor, for instance, machinery

8    equipment, that kind of stuff, computers.

9        Q.    Do you have any other assets?

10       A.    Just intellectual property, machinery, equipment,

11   electronics.   That's it.

12                Well, okay.   I could be mistaken.

13   Stavatti -- Stavatti International, I guess, at this point

14   or Stavatti Aerospace, we own a whole bunch of movie stuff

15   related to the motion picture ownership of Bryan Cranston's

16   father.   A couple Bryan Cranston movies.

17                Joe Cranston.   So if you want to make a

18   western movie, we have all of his old scripts.   Motion

19   picture stuff.   Also stars with Ernest Borgnine.   For the

20   record, we own a movie that stars Bryan Cranston as a young

21   actor and Ernest Borgnine.   So all international DVD rights

22   we own for that -- for that particular movie.   And I forget

23   his name.   But if you look up Bryan Cranston and Ernest

24   Borgnine in a film together, we have that.

25       Q.    You previously stated that you were in the process



87

1      A.    As a -- as a dealer, essentially, yeah.  So...

2      Q.    And what entity was that through?

3      A.    That was through Stavatti Corporation.

4      Q.    And in what year?

5      A.    Oh, that was in the 2000 time frame, so between

6    the year 2001, 2002, 2003 that time period.

7      Q.    And I know that's a long time ago, but to the best

8    of your recollection, how much revenue was generated as a

9    firearms dealer?

10      A.    Oh, not very much.  That was, you know, on the

11    order of, say, $50,000 or less.  It's really a secondary

12    business.

13      Q.    You previously mentioned you had a Reg D investor,

14    Jim Phillips?

15      A.    Uh-huh.

16      Q.    When did Mr. Phillips make his investment?

17      A.    I believe that was like -- I want to say

18    December 12th or December 7 -- early December.

19      Q.    Of?

20      A.    2024.

21      Q.    Of 2024.  And do you remember the approximate date

22    that you registered that sale with the SEC?

23      A.    So what we did for our Reg D offering.  This whole

24    process started in November 1st.  That was our official

25    release of our Rule 506 D Regulation (b) offering.  Let me

**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

88

1    see if I pronounced that right.

2              So it's a Regulation D 506(b).  Okay.  That

3    offering memorandum began circulation officially on

4    November 1st.  We had our first subscribers in the middle

5    of November.  We filed the registration within 15 days of

6    getting our initial investment.

7              And so the Form D was filed with the SEC, I

8    believe, right around November, let's say, 18th or

9    something.  I think we were going to file it on the 15th

10   and then we discovered we needed to have something

11   notarized.  So we got it notarized, and that delayed the

12   filing a few days, and then we went ahead and filed it, I

13   think, by the 22nd.

14       Q.   Yeah.  That requires that whole online process.

15       A.   And so we did that.  And then we filed with -- we

16   went to the -- you know, with the State of California.  We

17   did it individually because they had their portal, so we

18   did that online.  And then we filed for about five other

19   states that we have potential investors from, using the

20   master portal filing system.  I forget what they call it.

21   So those Form Bs were registered.

22       Q.   And how many subscribers did you get?

23       A.   So far we have, I think, 12.

24       Q.   Okay.  And what was the aggregate value of those

25   12 subscribers?



99

1   jumping in, but income from your wife.  I suppose she

2   worked.  Right?

3            **THE WITNESS:  Oh, yeah.  Well, she -- yeah,**

4   **she has her Southern California Edison.  That's one of the**

5   **reasons --**

6   BY MR. CHEBAT:

7       Q.   She's an engineer at Edison.  We're aware.

8       **A.   Yeah.  She's on their firefighter team right now,**

9   **so that's -- it's very important that she wasn't here**

10  **yesterday simply because of that.**

11      Q.   Moving over to another topic.  Your digital

12  footprint.

13           Who is responsible for the Stavatti website?

14      **A.   That would be me primarily.**

15      Q.   And you have custody over the domain access and to

16  the administrative portal, the ability to --

17      **A.   Yes.**

18      Q.   -- update materials on the website?

19      **A.   Correct.**

20      Q.   And can the same be said for the e-mail domain,

21  like individuals who would have a Stavatti.com e-mail

22  address?

23      **A.   Yes.  We did have an individual who was our**

24  **Webmaster.  His name was Joseph Lind, and he served as**

25  **Webmaster from, oh, probably 1997 until 2008.  And then in**

**Dimitrov vs**                                           Christopher R. Beskar
**Stavatti Aerospace**

100

1    2008, we got everything set up, so I would pretty much

2    handle that until we brought on some other people to do

3    that.

4                And then in -- I think it was 2017, we did a

5    mass change order.  We went from how we used to do it,

6    which was an HTML website, to a WordPress site.  And then

7    we had hired a company in probably about 2019, I think,

8    2020 -- let's say 2020, probably -- that did a major

9    website upgrade.

10                And then in 2020, once that was established,

11   it went back to me serving as the custodian for the

12   website.  And the website, we haven't really done very much

13   with the website other than posted some updates, news

14   releases, and things like that.

15                Since then, I'm responsible for the Twitter

16   and the Facebook and the LinkedIn for the company.  We do

17   have, through the PHP web hosting, which provides the

18   server services, we do have some of their support with

19   respect to the operations of, you know, the -- just the

20   mechanics of the website and the mechanics of the e-mail

21   addresses and all that.

22                So in the sense that I coordinate with the

23   company as I run the domain names and web hosts, yeah.  So

24   that's -- right at the moment, I'm primarily responsible

25   for that.



**Dimitrov vs**                                          Christopher R. Beskar
**Stavatti Aerospace**

109

1   Correct?

2       **A.    Correct.**

3       Q.    Thank you.

4       **A.    That's probably a miswrite.**

5              MR. DUNMIRE:  Could you identify the page

6   number on that -- what you just had him read?

7              MR. CHEBAT:  Absolutely.  Let the record

8   reflect that that is on the Stavatti website.  The

9   hyperlink would be www.stavatti.com/business-organization/.

10             **THE WITNESS:  Yes.  We will be updating our**

11  **website because those are not incorporated.**

12             MR. CHEBAT:  Thank you.

13             **THE WITNESS:  But also let the record show**

14  **that Stavatti does incorporate a lot of companies.**

15             MR. CHEBAT:  We're well aware, Mr. Beskar.

16  Thank you.

17  BY MR. CHEBAT:

18      Q.    Were you aware of the plaintiff's million dollar

19  investment?

20      **A.    Yes, I was aware of the investment.**

21      Q.    And how were you made aware of it?

22      **A.    It arrived in our bank account.**

23      Q.    And had you ever had any correspondence in advance

24  with anybody at a Stavatti entity about a potential

25  investment?



110

1    A.   We knew of a potential investment.  The potential

2  investment that I was aware of was really reflected in a

3  document, I believe, dated maybe January 10th or

4  February 10th.  That was kind of an original proposed

5  concept, but the -- the idea of an investment was

6  circulating, yes.

7    Q.   And who made you aware of that?

8    A.   That was Brian Colvin.

9    Q.   And at the time, what was Brian Colvin's role?

10   A.   Brian Colvin was brought in as a person to help

11 fundraise for Stavatti.  I don't know exactly how much

12 detail you wish for me to provide.

13        But he was originally introduced through an

14 associate of mine, Shel Erickson.  I believe he was working

15 with Shel as a person to help Shel secure investment

16 capital for his project.  And Brian was visiting Shel at

17 one time, and he came across the MiG-29 project

18 documentation.  We had a draft of a private placement

19 memorandum that we were proposing to circulate.  And he

20 wanted to be involved.  He contacted us and said he could

21 assist with that project.

22        MR. DUNMIRE:  Can I just interject before we

23 get too far away from it just for one moment?

24        You said a million dollars showed up in your

25 account.  I think that's a misstatement.

111

1           THE WITNESS:  Okay.

2           MR. DUNMIRE:  Because 900- showed up.

3    Correct?

4           **THE WITNESS:  Oh, actually, that is correct.**

5    **900,000 showed up.  Yeah, we --**

6           MR. DUNMIRE:  Terry, you'll have the

7    opportunity -- just might save it later.  I'm just trying

8    to --

9           **THE WITNESS:  True.**

10          MR. DUNMIRE:  -- take care of it.

11          **THE WITNESS:  That's true.**

12   BY MR. CHEBAT:

13     Q.   Thank you.

14          Did you ever meet with the plaintiff before

15   making the investment?

16     **A.   No.**

17     Q.   Did you sign any promissory note?

18     **A.   No.**

19     Q.   Did you provide a template promissory note with

20   your signature affixed?

21     **A.   No.**

22     Q.   When Brian Colvin was representing to you that he

23   would facilitate and with your permission he was brought on

24   to help fundraise, did he ever represent to you that he was

25   a registered broker-dealer with the Securities and Exchange

112

1    Commission?

2        A.    No.

3        Q.    And are you?

4        A.    No.

5        Q.    Is it your contention that you did not sign the

6    promissory note?

7        A.    I didn't sign it, no.  That's correct.  I did not

8    sign the exact note.  What would usually happen, like in

9    the case of any investment document that Stavatti does, how

10   I like to see it happen and how the procedure is, is I get

11   an idea of what kind of relationship we'll have.  We put

12   the terms together on a piece of paper that I create.  It

13   is then issued to the party.  They execute the agreement,

14   and then I will sign it.  And depending on what the deal

15   is, we may have that notarized.

16       Q.    And then how long after that -- those funds hit

17   your account did you contact the bank to let them know it

18   was erroneous?

19       A.    We did not contact the bank to let them know it

20   was erroneous.  We accepted it as an investment.

21       Q.    Absent, according to your contention, a signed

22   document from you?

23       A.    Correct.

24       Q.    And do you just -- is it standard process at

25   Stavatti to accept gratuitous investments?



114

1          MR. DUNMIRE:  Objection.

2    BY MR. CHEBAT:

3       Q.   For the record --

4       **A.   Money.**

5       Q.   -- hundreds of thousands of dollars end up in your

6    corporate accounts, and you did not contact the bank to let

7    them know it was in error.  Correct?

8       **A.   We did not believe it was an error.  We took it as**

9    **an investment.  However, it was an investment by an**

10   **individual who had mismanaged the process of having an**

11   **investment come into the company and also prevented us from**

12   **engaging the investor.**

13      Q.   It is Brian Colvin's contention that he reached

14   out to you in advance in writing for approval on the terms

15   of this note, this note being the note that was entered

16   into with my client.  Is that correct?

17          MR. DUNMIRE:  Objection.

18          **THE WITNESS:  The -- the terms of the note as**

19   **it was presented to me and the actual terms of the note --**

20   **and this is where things get really irritating to us.  We**

21   **were never provided with the final version of the note**

22   **until our accounting service, Bonadio, demanded it from**

23   **Brian.  And this was probably in August or September of, I**

24   **think, 2022.  So we didn't see a final copy.  We had -- I**

25   **had a version of an investment agreement that I believe was**

115

1   presented to Mr. Dimitrov that I had approved as a working

2   term sheet.

3            From the time that that working term sheet

4   was put together to the final term sheet, there's -- there

5   were changes made that I did not approve, that we did not

6   review that Brian Colvin never presented to our board of

7   directors.  And so Brian went off and put together an

8   agreement.  And under our assumption that he was working on

9   the original term sheet, we would accept those terms.

10           However, I would have been responsible for

11  signing off on something.  And this is the challenge that

12  we faced in working with Brian.  He failed to provide us

13  with final documentation.  He failed to provide us with a

14  face to face or tabletop meeting with Mr. Dimitrov.  He

15  failed to facilitate a relationship.

16           This was even the case with Rudy Chacon.  I

17  had never met Rudy in person.  I hadn't met Rudy in person.

18  Never even talked to him on the phone.  Never talked to

19  Mr. Dimitrov on the phone.

20           So Brian was engaging in activities where

21  he's keeping information and contacts very close to the

22  vest.  So he had a network of individuals who he claimed

23  were lenders or investors that Stavatti was not introduced

24  to.

25           And I -- you know, we didn't have an



128

1    at that time, too, is we are constantly being told by Brian

2    two things.  And this is kind of the greater context of the

3    situation.

4              We had engaged DelMorgan & Co as a FINRA

5    registered broker-dealer to raise money for us.  You know,

6    they were to raise $35 million in support of our MiG-29

7    project.

8              The original reason we took this loan was to

9    pay for DelMorgan.  They had a $100,000 fee.  We paid them.

10   We paid them in four increments.  Our engagement with

11   DelMorgan was on the 21st of February, 2022.

12             We -- you know, Ukraine was invaded that

13   week.  I think it was on the 24th, so within two days, you

14   know, here we are.  We have a proposal for the Ukraine Air

15   Force.  Ukraine just got invaded.  Should I continue this?

16   Q.   No.  I think I have a fair understanding.

17   A.   Okay.

18   Q.   What I think is a particular interest in order to

19   dispel, I guess, the representations in discovery that

20   Mr. Colvin has made is to have a better understanding of

21   how he came into the picture.

22             So is it correct that when he was brought on,

23   he was a vice president?

24   A.   Yes.  We made him a vice president so he could

25   represent Stavatti to investors.  Correct.



**Dimitrov vs**                                               Christopher R. Beskar
**Stavatti Aerospace**

129

1      Q.    Correct.  And he had a letter of representation

2    that allowed him to do that?

3      **A.    Yes, he did.**

4      Q.    And that was executed by you?

5      **A.    That is correct.**

6      Q.    Okay.  And in February, he solicited the funds

7    from my client?

8      **A.    Uh-huh.**

9      Q.    And it is your contention that he did so without

10   authority?

11     **A.    He had the authority to solicit funds, but he did**

12   **not have the authority to craft term sheets and develop a**

13   **business relationship that didn't have my purview,**

14   **approval, complete control and making sure that I know who**

15   **the investor is, what the terms are.**

16            **He basically had the approval to work in a**

17   **finder capacity, as an introducer.  Closing of the**

18   **transaction, that was expected to be in concert with our**

19   **approval.**

20            **Furthermore, before we move forward on any**

21   **significant loan or significant investor, we really do need**

22   **to have a board of director's approval.  We need to have**

23   **presentations to our company.  And case in point, this**

24   **whole Kennedy loan that we're getting, we had full-blown**

25   **board meetings.  We have copies, you know, of those**

134

1      Q.   It says:  Dear Brian, thank you.  This looks good

2  to me.  Best regards, Chris.

3      A.   Do you want me to comment on that?

4      Q.   I -- I would -- do you --

5      A.   If I received that e-mail today from Brian, he

6  would have gotten a five-paragraph dissertation on 10 X

7  will not work.  So the probability that I responded in that

8  matter is close to zero.

9      Q.   So you --

10     A.   I -- I have -- I don't remember responding in that

11 manner.

12     Q.   So you don't recall.  Okay.

13     A.   Furthermore, I think an e-mail like that with a

14 proposed statement of that would have been sent not just by

15 me.  It would've been copied to our board of directors and

16 other key people, including Bill Mcewen, and Bill Mcewen's

17 feedback probably would have been, you know:  You've got to

18 change these terms, Brian.  You know, we need to have -- we

19 need to have a sit-down discussion of what the actual terms

20 are going to be.

21          So it's -- it's -- I don't -- I don't recall

22 replying in that manner, and it's irregular.

23     Q.   You previously kind of discussed a dwindling of

24 the relationship with Mr. Colvin after you, as you put it,

25 contend that he went rogue.

**Dimitrov vs**                                              Christopher R. Beskar
**Stavatti Aerospace**

160

1    December of 2023 -- yeah, it was 2023, then all of --

2    any -- any activity we did in aerospace, including drones,

3    be done exclusively through Stavatti Aerospace.

4         Q.   And you're aware that prior to initiating this

5    lawsuit, my client, through counsel, sent a demand letter.

6    Correct?

7         A.   Yes.

8         Q.   And you responded to that demand letter?

9         A.   Correct.

10        Q.   Which was to me?

11        A.   To you, yes.

12        Q.   To me.

13        A.   I wrote it.

14        Q.   And would you acknowledge that this document here,

15   this letter on -- was authored from you --

16        A.   Yes.

17        Q.   -- to me?

18        A.   Yeah.

19        Q.   The document that is attached as --

20        A.   Correct.

21        Q.   -- Exhibit L to the complaint?

22        A.   Uh-huh.  Yes.

23        Q.   Can you please read the highlighted area of the

24   letter, please, for the record.

25        A.   Sure.

**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

161

1           "Yes.  The one million loan provided by

2           Mr. Dimitrov as an angel investor lender was

3           received on 1 March, 2022, by Stavatti to

4           serve as seed capital for the purpose of

5           paying initial fees associated with DelMorgan

6           & Co, DelMorgan, investment banking firm

7           engaged by Stavatti."

8      Q.   Thank you.

9           We previously discussed bank accounts.

10     A.   Uh-huh.

11     Q.   And per your description, the primary account, as

12   you called it, is the account ending in 7316.  Correct?

13     A.   Correct.

14     Q.   And that's a bank account with Bank of America.

15   Is that correct?

16     A.   That's correct.

17     Q.   And would you say that you reasonably monitor that

18   account in your position as --

19     A.   I do.

20     Q.   Thank you.

21          And are you aware that on March 1st of 2022,

22   that that account received a counter credit of $912,500?

23     A.   Yes.

24     Q.   Are you also aware that on -- to that same

25   account, on April 20th of 2022, the company received an

**Dimitrov vs**                                              Christopher R. Beskar
**Stavatti Aerospace**

162

1    additional counter credit of $100,000?

2    **A.    Yes.  I believe we did, yes.**

3    Q.    Are you aware that it is Brian Colvin's contention

4    that he deposited those funds into those accounts?

5    **A.    That's what I understand, yes.**

6    Q.    And you acknowledge receipt of those funds?

7    **A.    Yes.**

8    Q.    Well, once those funds were received, did you

9    reach out to the Plaintiff at all?

10    **A.    I attempted to.  I had asked Brian to contact him.**

11    Q.    And what did Brian do when you asked to be put in

12    contact with?

13    **A.    He did not contact Dimitrov on our behalf.  He**

14    **didn't -- he didn't have a conference call.  He didn't**

15    **arrange for any meetings.  As a matter of fact, I had even**

16    **traveled to Las Vegas at different times on business, and I**

17    **had asked, Brian:  Hey, we're in the area.  Doesn't**

18    **Dimitrov live in Las Vegas?  Should we set up a meeting and**

19    **say hello?**

20    **And he did not accommodate such request.**

21    Q.    When was the first time you had any correspondence

22    with the Plaintiff?

23    **A.    Probably through the lawsuit.  I think through**

24    **your --**

25    Q.    Through the precede -- through the demand letter



**Dimitrov vs
Stavatti Aerospace**                                    Christopher R. Beskar

163

1    that preceded the lawsuit?

2        A.    Yeah.  Yeah.  The only -- the only point of

3    contact that Stavatti had with Valentino Dimitrov that I

4    was in communication or anyone else did was Brian Colvin.

5        Q.    So am I correct in saying that before today, you

6    had never even spoken to him?

7        A.    I had not spoken with him.  Didn't know who he

8    was.

9        Q.    You had only engaged with him through his counsel

10   that being --

11       A.    That being you.

12       Q.    Correct.

13       A.    Didn't have his phone number.  As a matter of

14   fact, I don't think I got his phone number until

15   Brian Colvin surrendered the promissory note that -- under

16   Bonadio's request to do an audited financial statement.

17       Q.    Which had it on it?

18       A.    Which had it on it, correct.

19       Q.    Once the funds were received, other than the

20   remittance to DelMorgan, which you expressed was the need

21   for those funds -- for those funds in your letter --

22       A.    Uh-huh.

23       Q.    -- what else was the money used for?

24       A.    To pay off some of these debts associated with

25   9400 Porter Road.  We used it to engage the services of



**Dimitrov vs**
**Stavatti Aerospace**

Christopher R. Beskar

164

1    T3 Enterprises, general business operating expenses

2    associated with that.

3              I think at some point I provided a list.  I

4    mean, it's within that -- our bank statement reflects where

5    money went in that time period.  So...

6        Q.    Sure.  And you can confirm that John Simon has

7    signature authority over the Stavatti Niagara account.

8    Correct?

9        A.    Correct.  And so a certain portion of funds would

10   be transferred to that, and they would be spent on the

11   expenses associated with 9400 Porter Road.

12       Q.    Does anybody other than yourself have signature

13   authority over that -- over the primary account, the 7316

14   account?

15       A.    No.

16       Q.    Does that include your wife?

17       A.    She has no signatory authority over any Stavatti

18   accounts.

19       Q.    In reviewing the cap table, a particular

20   shareholder was of interest just given the amount of equity

21   he purportedly has, that being David Wilcock.

22       A.    Uh-huh.

23       Q.    How does Mr. Wilcock acquire that many shares in

24   Stavatti Enterprises?

25       A.    David was one of our founding shareholders.  David



169

1          THE WITNESS:  Oh, oh, I see it.

2          MR. CHEBAT:  Super Fulcrum.

3          MR. DUNMIRE:  Yeah.  Okay.

4          THE WITNESS:  Yeah, those are projections.

5    BY MR. CHEBAT:

6       Q.   And so given your testimony prior, based -- if the

7    definition of an employee is somebody who's a wage earner

8    at the organization, there were no employees.  Correct?

9       A.   If you use that definition as opposed to the SBA

10   definition, correct.

11      Q.   Correct.  Thank you.

12      A.   Did you --

13      Q.   Can you --

14      A.   I don't know if I can ask you questions or not.

15      Q.   I'm okay with you asking me a question.  It's

16   quite unconventional, but go on.

17      A.   Well, I was wondering if you or the Plaintiff ever

18   received the message from the Ukrainian military attache

19   that states we -- you know, basically paraphrasing:  When

20   you have your prototype, we will issue you a contract.

21   Which is pertinent to this.

22          Because the whole situation with Ukraine is

23   very straightforward.  Ukrainian Ministry of Defense, in an

24   effort to not be considered a corrupt entity, which is a

25   big issue with Ukraine -- corruption's a big problem --

171

1      A.    Is it irrelevant?

2      Q.    It's not that it's irrelevant.  It's not in

3   response to my question.  Ask me a question, I'd be happy

4   to respond to it.  I can't comment on as to whether I saw

5   that letter from the Ukrainian.

6      A.    We can provide it.  But we have a lot of stuff

7   like that.

8      Q.    What was your understanding of the purpose of the

9   Plaintiff's investment?

10     A.    The purpose of the Plaintiff's investment was to

11  raise $100,000 to pay DelMorgan their initial up-front fee

12  of $100,000 so that they can then be engaged and write the

13  private placement memorandum and go forth and raise the

14  money we need to build the prototype of the MiG to get the

15  Ukrainian contract to go for it and build upgraded MiGs,

16  and then we'll be happily ever after.

17     Q.    So is it fair to say that at the time you believed

18  that Stavatti would be able to repay the Plaintiff's loan

19  according to his terms --

20     A.    Oh, yes.

21     Q.    -- given the impending financing?

22     A.    Yeah, we were -- we were of the understanding that

23  DelMorgan being a professional banking firm would have this

24  done in a jiffy, that they -- within 30 days, they'd crank

25  out the documentation needed, and that they had a network

**Dimitrov vs**                                                    Christopher R. Beskar
**Stavatti Aerospace**

177

1          **THE WITNESS:  He is a -- he's a current**
2     **certified pilot and still regarded as one of the best**
3     **pilots out there.**
4     BY MR. CHEBAT:
5        Q.   Great.
6        **A.   He's getting a little too -- too old to do the**
7     **financial work.**
8             MR. DUNMIRE:  Well, good for him, I guess.
9             **THE WITNESS:  He's going to be more of a good**
10    **trainer, a goodwill ambassador kind of guy.**
11    BY MR. CHEBAT:
12       Q.   Okay.  You acknowledged receipt of the funds of
13    the million dollars in your response to the demand letter.
14             Do you acknowledge the necessity to repay the
15    Plaintiff?
16       **A.   Yes.  I acknowledge the necessity to repay the**
17    **Plaintiff, yes.**
18             **I will dispute the payment amount, but I**
19    **acknowledge the receipt to pay at least $900,000 because**
20    **that is what we have duly received and agreed to.**
21       Q.   Despite the fact that in your letter you stated
22    and you read it here on the record for us, that you can
23    confirm receipt of the $1 million.  Correct?
24       **A.   That -- yeah, well, you know, it was --**
25       Q.   Thanks.

**Dimitrov vs**                                                    Christopher R. Beskar
**Stavatti Aerospace**

178

1        A.    -- under duress.  It wasn't official.

2        Q.    Who was putting you under duress at that time?

3        A.    Oh, I just -- you know, you sent a demand letter.

4    So, you know, you stated a million dollars, and the

5    question with Brian was of --

6        Q.    I'm sorry.  Who put you under duress?

7                MR. DUNMIRE:  Why don't you let him finish?

8                THE WITNESS:  Oh, no.  It's just that when

9    you receive a demand letter requesting things, you put

10   together a response.  And with respect to Brian, you know,

11   aggregate -- in the aggregate between Stavatti and Brian,

12   Valentino Dimitrov had invested a million dollars.

13                The question is:  During that time

14   Brian Colvin was still part of the Stavatti organization,

15   and part of our due diligence as a company is finding out

16   what Brian has done and what he hasn't done.  And in the

17   course of our own due diligence on the relationship with

18   Brian, which spanned the course of time between we met

19   Brian and up until we dismissed him in November, we didn't

20   really know what Brian was doing, which may sound like a

21   strange thing to do, but Brian didn't share all of his

22   information, it has become very evident.  And as we learned

23   more -- and one sidebar note that I just want to expand on

24   real quick is, after Brian left, I started getting phone

25   calls from people who own drone companies saying that:  We

207

1            CERTIFICATE OF CERTIFIED REPORTER

2            BE IT KNOWN that the foregoing proceedings were
taken before me; that the witness before testifying was
3    duly sworn by me to testify to the whole truth; that the
foregoing pages are a full, true, and accurate record of
4    the proceedings, all done to the best of my skill and
ability; that the proceedings were taken down by me in
5    shorthand and thereafter reduced to print under my
direction; that I have complied with the ethical
6    obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206
J(1)(g)(1) and (2).

7
            I CERTIFY that I am in no way related to any of
8    the parties hereto, nor am I in any way interested in the
outcome hereof.

9

10            [X]  Review and signature was requested; any
changes made by the witness will be attached to the
11    original transcript.
            [ ]  Review and signature was waived/not
12    requested.
            [ ]  Review and signature not required.

13

14            Dated at Phoenix, Arizona, this 24th day of
February, 2025.

15

16

                _____/s/ Pamela A. Griffin___ _
17              PAMELA A. GRIFFIN, RPR, CRR, CRC
                     Certified Reporter
18                Arizona CR No. 50010

19            *        *        *        *        *

20            I CERTIFY that GRIFFIN GROUP INTERNATIONAL, has
complied with the ethical obligations set forth in ACJA
21    7-206 (J)(1)(g)(1) through (6).

22

23                _____/s/ Pamela A. Griffin_____
                GRIFFIN GROUP INTERNATIONAL
24                Registered Reporting Firm
                  Arizona RRF No. R1005

25

