1  Terrance D. Dunmire, Esq. (9964)
2  Law Offices of Terrance D Dunmire
   8701 E. Vista Bonita Drive, Suite 220
3  Scottsdale, Arizona 85255
   Phone (602) 264-1300
4  tdunmire@parkwestpartners.com
5  Attorney for Defendants (except Brian and Corrina Colvin)

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Valentino Dimitrov, individually, and on behalf of all others similarly situated;<br><br>Plaintiff,<br><br>v.<br><br>Stavatti Aerospace. Ltd, a Minnesota corporation; Stavatti Aerospace Ltd, a Wyoming corporation; Stavatti Corporation, a Minnesota corporation; Stavatti Immobileare. Ltd. A Wyoming corporation; Stavatti Niagara, Ltd. A New York corporation; Stavatti Super Fulcrum, Ltd, a Wyoming corporation; Stavatti Ukraine, a Ukrainien business entity; Stavatti Heavy Industries Ltd. a Hawaii corporation; Christopher Beskar and Maja Beskar, husband and wife; Brian Colvin and Corrina Colvin, husband and wife; John Simon and Jean Simon husband and wife ; William Mcewen and Patricia Mcewen, Husband and wife; Rudy Chacon and Jane Doe Chacon. Husband and wife; and DOES 1-10, inclusive<br><br>Defendants. | Case No. 2:23-CV-00226-DJH<br><br>DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS STAVATTI AEARSPACE LTD., AND CHRISTOPHER BESKAR |

Defendants Stavatti Aerospace Ltd, a Wyoming corporation (hereafter the "Corporation") and Christopher Beskar, two of the fourteen originally named defendants, by and through undersigned counsel on their behalf and on behalf of the other named defendants, with the exception of Brian Colvin, (hereinafter sometimes the "Represented Defendants") respectfully submit this Response in Opposition to Plaintiff's Motion for Summary Judgment against Stavatti Aerospace LTD., a

Wyoming corporation and Christopher Beskar. This response is supported by the following Memorandum of Points and Authorities.

## Memorandum of Points and Authorities

**Introduction:**

Plaintiff filed his complaint alleging all manner of deceitful, nefarious and conspiratorial conduct by eight separate corporations and five individuals along with their wives concerning a promissory note created by Defendant Brian Colvin and signed by Plaintiff but not signed or authorized by the Company (the Promissory Note). Fortunately, as evidenced by Plaintiff's motion, Plaintiff has come to realize that this imagined network of fraudsters does not exist or at least had nothing to do with the Promissory Note at issue in this litigation. Plaintiff is now focusing on summary judgment against only one company, Stavatti Aerospace LTD, a Wyoming corporation (the "Company"), its CEO Chris Beskar and the Company's problem former associate, Brian Colvin who along with Plaintiff himself is largely responsible for the problems that resulted in this litigation.

**Factual Background**:

1. Plaintiff made his loan to the Company based upon his conversations with Defendant Rudy Chacon. See Deposition of Valentino Dimitrov attached as Exhibit A at 25-27
2. Plaintiff's whole connection to this investment was Defendant Rudy Chacon. See Dimitrov's depo/Exhibit A at 27-28.
3. Plaintiff did not speak with Brian Colvin until after his investment into the Company See Dimitrov's depo/Exhibit A at 26: 14-16
4. Plaintiff had no conversation with Chris Beskar before making his investment into the Company. See Dimitrov's depo/Exhibit A at 28 and 38.
5. Plaintiff did not speak with any of the other individually named defendants (other than Rudy Chacon) prior to making his loan to the Company. See Dimitrov's depo/Exhibit A at 28-29

2

6. None of the named corporate defendants made any representations to Plaintiff to entice Plaintiff into making his loan to the Company. See Dimitrov depo/Exhibit A at 29: 9-12.

7. Plaintiff understood in his conversations with Rudy Chacon that the Company was in negotiations with an investment banking firm named Del Morgan to provide funding for the Company. See Dimitrov's depo/Exhibit A at 39: 12-16.

8. The Company was in negotiations with Del Morgan to provide funding for the Super Fulcrum project. Referenced below.

9. The Company had created a draft Private Placement Memorandum (PPM) for use by Del Morgan for the Super Fulcrum project.[1] See Deposition of Chris Beskar attached as Exhibit B at 166-167.

10. Plaintiff was not provided a copy of the PPM nor did he not see or read the draft PPM prior to making the loan. See Dimitrov depo/Exhibit A at 6-9.

11. Plaintiff never asked for any information on the company, financial statements etc. See Dimitrov depo/Exhibit A at 39.

12. Plaintiff made his investment into the Company solely on the suggestion of Rudy Chacon. See Dimitrov's depo/Exhibit A at 25-26

13. Rudy Chacon received no compensation for lending/investing into the Company. See Chacon depo/Exhibit C at 25: 11-18

14. Brian Colvin did not share with Chris Beskar or the Company who his prospective investors were and his actions while working for the Company

---

[1] The Super Fulcrum project was a plan to use the Company's proprietary technology to upgrade existing MIG-29 Fulcrum Aircraft fighter planes to current technological standards to be marketed, sold and provided to allied Mig-29 operators worldwide. This project was and is supported by the Ukrainian government who had issued a prospective order for x upgrades conditioned on the Company first making a prototype to demonstrate reality of the project.

3

were very secretive and he concealed the names of investors and others he was dealing with from the Company. See Beskar depo/Exhibit B at 184-185 and 202-204.

15. The Company was not provided with the Promissory Note before it was used and it had not been authorized for use by the Company. See Beskar depo/Exhibit B at 183: 2-4 and Affidavit of Chris Beskar attached as Exhibit D.

16. Brian Colvin never insisted on Plaintiff providing proof of his being an accredited investor. See Dimitrov depo/Exhibit A at 8-9.

17. Plaintiff however testified that he qualifies as an accredited investor. See Dimitrov depo/Exhibit A at 11: 15-24

18. Rudy Chacon learned about Stavatti after talking with Brian Colvin. He had known Brian Colvin for approximately 20 years. Mr. Colvin told him about the Company and the fact that the Company was working with an investment banking firm named Del Morgan to raise funds for the Company. See deposition of Rudy Chacon attached as Exhibit C at 17:11-19.

19. Rudy knew Plaintiff and introduced him to the investment opportunity that Brian had spoken with him about. Rudy had no prior connections or association with the Company. Rudy introduced the Stavatti opportunity presented to him by Brian Colvin to Plaintiff and others in a pool of investors who were interested in participating in something. See Chacon depo/Exhibit C at 14-15.

20. Mr. Chacon invested around $225,000 into the Company. See Chacon depo/Exhibit C at 19: 4-7.

21. Mr. Chacon's investment was made upon the same terms as the Dimitrov Promissory Note. See Chacon depo/Exhibit C at 31: 12-16.

22. Mr. Chacon obtained the information upon which he used to decide to invest in the Company exclusively from Brian Colvin. He also researched Del

4

Morgan and was suitably impressed with that company. See Chacon depo/Exhibit C at 17: 11-19.

23. Mr. Chacon was not familiar with the Company's business operations and the success of the Company didn't matter to him. The basis of his investment decision was the possibility that Del Morgan might fund the Company because "if Del Morgan funded as it was proposed to do then we would be out before there was any operation." See Chacon depo/Exhibit B at 32: 16-24.

24. Mr. Chacon made no representations to Plaintiff about the Company's financial condition. See Chacon depo/Exhibit B at 29:11-16.

25. A number of other investors, also introduced by Rudy Chacon to the investment opportunity presented to him by Brian, also invested in the Company on the same terms as the Dimitrov Promissory Note. See Chacon depo/Exhibit C at 32: 10-12.

26. Del Morgan was engaged to raise funds for the Company and was paid $100,000 in four increments to do so. See Beskar depo/Exhibit B at 128: 4-15.

27. The Company's process for taking on investors was well known in the Company. Someone brings forth investors and then in short order they would meet with the investors and prepare documents reflecting the parties' agreements. See Beskar depo/Exhibit B at 116: 2-16.

28. Chris Beskar did not know and had never met with or spoken with Plaintiff or with Rudy Chacon before Plaintiff and Mr. Chacon made their investments into the Company. He did not sign the promissory note and did not provide a template of a promissory note with his signature attached for use by Brian Colvin, See Beskar depo/Exhibit B at 111: 14-21.

29. When the $900,000 and some other funds were deposited to the Company's bank account they accepted them. Brian Colvin had not provided the

Company with any documents related to the deposits and so the Company began requesting that information from him (Brian). The entire process was very strange, unexpected and not normal. When the money came in the Company did not have a way to contact the investor or know where to send a thank you note. See Beskar depo/Exhibit B at 112 -113

30. The Company did not believe it was deposited in error. They took it as an investment, however, as an investment coming in by way of an individual who had mismanaged the process of investment into the Company and who had prevented it from engaging the investor". See Beskar depo/Exhibit B at 114: 8-12

31. The Company did not receive a copy of the Promissory Note until August or September when the Company's accounting service was doing an audited financial statement and demanded a copy of it from Brian. The terms of the Promissory Note had never been approved by the Company. See Beskar depo/Exhibit B at 114-15 and 163

32. Mr. Colvin was keeping his network of investors secret and would not share their identities or facilitate introductions to others in the Company. He did not inform the Company of the details of Plaintiff's investment. Not until August/September 2022, when Brian surrendered the Promissory Note which had Plaintiff's telephone number on it, did the Company have a means to locate him, other than through Brian who was keeping that from happening. See Beskar depo/Exhibit B at 115 and 163

33. The Company has procedures to be followed when accepting capital contributions. Brian did not follow those rules and procedures. While he was authorized to solicit funds he did not have the authority to craft terms sheets or to develop business relationships without the purview of Chris Beskar. In this case Brian Colvin was acting in a rogue capacity. See Beskar depo/Exhibit B at 129-130.

6

34. The Company began realizing it had problems with Mr. Colvin in March of 2022 when they learned of serious misrepresentations by Mr. Colvin not only to investors and lenders but also the US Government culminating in around September of that year. The Company learned that Mr. Colvin was not only misrepresenting himself and the Company but also self-dealing to the detriment of the Company resulting in his termination. See Beskar depo/Exhibit B at 118: 6 to 126: 23.

35. Mr. Colvin created such problems with his misrepresenting himself as the Company president that the Company felt compelled to issue him business cards naming him as president in an effort to do damage control and to save corporate face. See Beskar depo/Exhibit B at 182: 2-13.

36. Mr. Colvin appears to have sent Chris Beskar an email on February 15, 2022 which said that the "funding that was coming in will be structured as follows" then went on to suggest how the "PPO Project Equity" would be calculated and went on to specify the agreements to be generated for the prospective transactions. See Plaintiff's Exhibit 68-13   Mr. Beskar appears to have responded saying "Thank you. This looks good to me" See Plaintiff's Exhibit 68-14.  At his deposition Mr. Beskar testified that "I don't recall replying in that manner, and its irregular". There are procedures for doing this sort of thing in the Company and this was not done in accordance with those procedures. See Beskar depo/Exhibit B at 134: 5-22 and 126. Mr. Colvin did not follow thru and provide any of the documents that his email said were to be generated for approval by the Company. Mr. Colvin's February 15 proposed investment terms were unworkable and unrealistic as had been his previous efforts to raise funds. Regardless, if that proposal had been adhered to it would have been followed up with draft subscription agreements and promissory notes for approval by the Company and its Board of Directors. No such documents were presented by Brian. If Brian

7

had provided the Promissory Note to the Company, it would not have been approved.  See Beskar's affidavit/Exhibit D.

37. The proper and planned procedure for raising funds under the prospective Del Morgan Regulation D offering for the Super Fulcrum project was to include very specific documents such as Subscription Agreements, non-disclosure agreements. shareholder agreements all properly executed and exchanged between the investor, Mr. Beskar and the Company. The transaction Mr. Colvin orchestrated with Plaintiff did not come close to the contemplated Reg D offering. It did not even follow the formalities specified in Brian's February 15, 2022 email; there were no Subscription Agreements or promissory notes provided to the Company as the email indicated would be forthcoming.  Brian failed to follow the process. See Beskar depo/Exhibit B at 116: 8-25 and 183-185.

38. The history of Brian Colvin's efforts to raise funds for the Company was problematic as he regularly would propose transactions which did not fit the corporate structure which focused on raising funds via proper Reg D offerings. Chris Beskar was able over the years to steer him back into line but unfortunately was kept out of the loop by Brian and so was unable to intervene when Brian was putting Plaintiff's investment into effect.  See Affidavit of Christopher Beskar attached hereto as Exhibit D.

39. Mr Colvin had not been authorized to take fees when raising money for the Company and was not authorized to take the fee he took for Plaintiff's investment.  See Affidavit of Christopher Beskar attached hereto as Exhibit D.

40. The Company has always been very careful in how it raises capital and does so properly in accordance with the law. The Company currently has around eighty shareholders and there has never been any shareholder litigation or

SEC complaints regarding the sale of unregistered securities. See Beskar Affidavit/Exhibit D.

41. The Company is a large well organized and properly run corporation following required corporate formalities with great business prospects. See Beskar Affidavit/Exhibit D.

**Legal Argument:**

    a. **Legal Standard**

Summary Judgment is not appropriate when there are genuine issues as to any material fact. Rule 56(a), Fed. R. Civ. P. Summary Judgment is precluded when disputes over material facts might affect the outcome and the disputed evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). Such is the case here.

    b. **Stavatti Aerospace and Chris Beskar did not violate any of the cited RICO statutes and did not intentionally sell any unregistered securities.**

All of the statutes referenced by Plaintiff contemplate liability for the intentional or reckless fraud in connection with the sale of securities. None of these statutes are applicable to the conduct of Mr. Beskar or the Company for the simple reason that Mr. Beskar and the Company did not even know about the terms of the Promissory Note until well after Mr. Colvin had orchestrated it. They did not know about the Promissory Note until well after its creation and had nothing to do with its creation therefore ruling out any intentional or reckless conduct on their part.

Mr. Colvin failed to follow the proper Company procedures in connection with Promissory Note. The terms of the Promissory note had not been presented to the Company for approval prior to its unauthorized execution.

9

If Represented Defendants were involved with a scheme to defraud anyone one would expect that there would be litigation or registered SEC complaints but there have been none. Brian Colvin's rogue actions in regard to the Promissory Note caused this unfortunate litigation.

### c. Neither Chris Beskar nor the Corporation signed or authorized the signing of the Promissory Note.

The Promissory Note allegedly signed by Defendant Company CEO Chris Beskar was in fact not signed or authorized by Mr. Beskar. A brief review of the Note itself readily shows that the signature was cut and pasted from another document. Mr. Beskar did not authorize Mr. Colvin to utilize his signature for this or any other purposes.

As a general principal of law, liability will not be imposed upon the putative principal for acts which are outside the scope of the principal/agent relationship. Engler v. Gulf Interstate Engineering, Inc., 230 Ariz. 55 at (2012). Mr. Colvin was acting outside the scope of his agency and the Company is not liable for his unauthorized actions.

### d. Brian Colvin did not have authority to use Chris Beskar's facsimile signature on the Promissory Note.

Plaintiff's claim is based on the erroneous assumption that Chris Beskar had signed the Promissory Note and that therefore it is enforceable against the Company. The above recited statement of facts provides evidence that Mr. Beskar did not authorize or sign the Promissory Note and furthermore did not authorize Mr. Colvin to use his facsimile signature on the Promissory Note or on the other notes orchestrated by Mr. Colvin.  While Mr. Colvin was hired on and given authorization to represent, assist and promote the Company in certain ways, the scope of his employment did <u>not</u> include the authority to sign binding financial agreements such as the Promissory Note in this case.

Plaintiff's underlying assumption is that Brian Colvin was the Company's agent acting within his proper scope of authority when he acted as he did in this case. Plaintiff will have to prove the existence of an agency relationship and in this case and he will not be able to do so. The case of Miller v. Mason-McDuffie Co. of S. Cal., 153 Ariz. 585, 589-93 (1987) is illustrative. The facts of that case are similar to those in ours and revolved around the whether or not the agent who was acting outside the scope of his authority had apparent authority to do what he did in that case. In its analysis of the concept of apparent authority and whether the principal in that case was responsible for the unauthorized acts of its agent, the Arizona Supreme Court wrote: "The touchstone of apparent authority is conduct of a principal that allows a third party reasonably to conclude that an agent is authorized to make certain representations or act in a particular way. It is firmly established that if the principal's conduct creates apparent authority, the principal is subject the liability for the agents' actions even if the agent was action for his own purposes. " Id

The basis of the forgoing legal principal is the concept of reasonable reliance. The Court went on the say that "In order to hold a principal liable for an agent's acts on a theory of apparent authority, the third party must show that his reliance upon the agent's apparent authority was reasonable. See, e.g., Lois Grunow Memorial Clinic v. Davis, 49 **Ariz.** 277, 284, 66 P.2d 238, 241-42 (1937) (person dealing with agent must exercise "due caution" in ascertaining scope of agent's authority); Shelby v. Zayre Corp., 474 So.2d 1069, 1071 (Ala.1985) (department store not liable to employee for alleged false statement made by assistant manager where employee's reliance on false statement not justifiable); O'Malley v. Putnam Safe Deposit Vaults, Inc., 17 Mass.App. 332, 337, 458 N.E.2d 752, 757 (1983) (irregular actions of employee not reasonably necessary to authorized duties not within employee's apparent authority)."

In our case, neither the Company or Christopher Beskar did or said anything to support a claim that Plaintiff relied upon to them to conclude that Brian Colvin was an authorized agent when he orchestrated an unauthorized transaction with an

11

unauthorized facsimile signature of the Company president. Plaintiff admitted that he made his decision to invest tin the Company solely on the basis of information he received from Rudy Chacon who in turn made his investment solely on the basis of information he received from Brian Colvin. Neither Plaintiff nor Rudy Chacon knew about the Company and had never met or spoken to Chris Beskar before Plaintiff's investment into the Company.

Given the facts and foregoing legal authority, it is clear that neither the Company or Mr. Beskar did anything to lead Plaintiff to believe that Mr. Colvin was authorized to present a promissory note that had not been authorized and was apparently too good to be true. Plaintiff made his decision to invest in the Company solely on information he learned from talking with Rudy Chacon.

Plaintiff might also suggest that even if the Promissory Note was not authorized by the Company that the Company's acceptance of the funds constitutes ratification of the unauthorized transaction. Mr. Beskar did send an email to Plaintiff's counsel after receiving an email from Plaintiff's counsel regarding default of the Promissory Note however that email simply confirmed that the Company intended to honor the obligation to repay the $1,000,000 loan which it had received. That letter did not suggest that the terms of the Promissory Note should be honored as an authorized transaction according to all its terms. The intent of the letter was to provide substantive backup to the bona fides of the Company and to assure Plaintiff that when funds became available that Plaintiff would be repaid.

Plaintiff asserts that Defendants are obligated to repay him not only the one million dollars he loaned to the Company but also interest on the money and a return of $5,000,000 in what he appears to contend was a guaranteed profit participation. A quick review of the Promissory Note shows that no interest rate is established but that profit participation of $5,000,000 would be payable within 48 months. The Note is clear that the principal was to be repaid on May 1, 2023, approximately two months after the loan was made. As specified in the Note, quarterly payments of

12

profit participation were to be made "*as the project progresses. The start date will be announced after the commencement of the project launch date.*" The Promissory Note does not contain a guarantee of profit. It is noteworthy that the "Project" was not identified but from the context it appears clear that the Promissory Note must have been referring to the Super Fulcrum Mig -29 upgrade project. The commencement date of that project was not announced for the simple reason that the project has not yet been funded. Accordingly, no profit participation can be reasonably expected by Plaintiff. While Plaintiff testified he never reviewed anything from the Company before making his investment, he did sign the Promissory Note and must be bound by its terms. He has not argued that he did not know what he was signing or that the Defendants somehow kept him from reviewing the Promissory Note before signing it.

Similarly, because the Promissory Note was not signed or authorized by the Company there is no contract to rely upon for the award of attorney's fees and so Plaintiff's insistence on a return of his attorney's fees is unsupported. If Plaintiff had exercised even a modicum of due diligence, something other than relying solely on Rudy Chacon's decision to invest in the Company, and sought to communicate with the Company president before making a million-dollar investment, he cannot complain about suffering some consequence for his lack due diligence.

**Summary**

Plaintiff made his investment into the Company based solely upon the fact that his friend Rudy Chacon was going to invest in the Company. He took a complete flyer and gambled on what looked like a very impressive investment without any input or reliance, reasonable or otherwise, upon actions of Chris Beskar or the Company (other than the unauthorized actions of Brian Colvin). As set forth in Represented Defendant's Motion for Summary Judgment, Plaintiff used a million dollars in cash for "his" investment that was not his to use and which he had not been authorized to invest. From the very outset of this

litigation and before, the Company has acknowledged receipt of the funds and has been clear in its intention to repay those funds. The complication now existing regarding repayment of the funds is that we now know that the funds Plaintiff used for the investment were not his to invest and he was not authorized by the owners to invest the funds the funds for them thus exposing Represented Defendants to liability to the real parties in interest should they pay those funds Plaintiff.  The Company stands ready to stipulate to judgment for the $1,000,000 provided the funds are somehow safeguarded by the Court to protect the real parties in interest and the Corporation for payment to Plaintiff.

**WHEREFORE,** based upon the forgoing, Represented Defendants respectfully request the Court to deny Plaintiff's Motion for Summary Judgment

**RESPECTFULLY SUBMITTED** THIS 5th day of September 2025.


BY____/s/ Terry Dunmire_____
       Terrance D. Dunmire

**EXHIBITS ATTACHED TO DEFENDANTS RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

EXHIBIT A:  Select pages from Plaintiff Valentino Dimitrov's deposition transcript.

EXHIBIT B:.  Select pages Chris Beskar's deposition transcript

EXHIBIT C:.  Select pages from Rudy Chacon's deposition transcript

EXHIBIT D: Affidavit of Christopher Beskar

CERTIFICATE OF SERVICE Terrance Dunmire hereby certifies that on this 5th day of September 2025, he electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, with transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Ross P. Meyer, Esq.
Enara Law PLLC
7631 East Greenway Road. Suite B-2
Scottsdale, Arizona 85260
ross@enaralaw.com
Attorney for Plaintiff

Nino Abate. Esq.
The law Office of Nino Abate. PLC
300 W. Clarendon Ave., Suite 130
Phoenix, Arizona 85013
nino@abatelaw.com
Attorney for Brian and Corrina Colvin

Copy of the forgoing mailed
this 5th day of September 2025 to:

HONORABLE DIANE J. HUMETEWA
United States District Court Sandra Day O'Connor US Courthouse. Suite 625
401 West Washington Street, SPC 81
Phoenix, Arizona 85003

By: /s/ Terry Dunmire

.