# EXHIBIT B
# Select pages Chris Beskar's deposition transcript

In the Matter of:

*Dimitrov*

*vs*

*Stavatti Aerospace*

*Christopher R. Beskar*

*January 24, 2025*



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

Page 110

1   A. We knew of a potential investment. The potential
2   investment that I was aware of was really reflected in a
3   document, I believe, dated maybe January 10th or
4   February 10th. That was kind of an original proposed
5   concept, but the -- the idea of an investment was
6   circulating, yes.
7   Q. And who made you aware of that?
8   A. That was Brian Colvin.
9   Q. And at the time, what was Brian Colvin's role?
10  A. Brian Colvin was brought in as a person to help
11  fundraise for Stavatti. I don't know exactly how much
12  detail you wish for me to provide.
13         But he was originally introduced through an
14  associate of mine, Shel Erickson. I believe he was working
15  with Shel as a person to help Shel secure investment
16  capital for his project. And Brian was visiting Shel at
17  one time, and he came across the MiG-29 project
18  documentation. We had a draft of a private placement
19  memorandum that we were proposing to circulate. And he
20  wanted to be involved. He contacted us and said he could
21  assist with that project.
22         MR. DUNMIRE: Can I just interject before we
23  get too far away from it just for one moment?
24         You said a million dollars showed up in your
25  account. I think that's a misstatement.

Page 111

1          THE WITNESS: Okay.
2          MR. DUNMIRE: Because 900- showed up.
3   Correct?
4          THE WITNESS: Oh, actually, that is correct.
5   900,000 showed up. Yeah, we --
6          MR. DUNMIRE: Terry, you'll have the
7   opportunity -- just might save it later. I'm just trying
8   to --
9          THE WITNESS: True.
10         MR. DUNMIRE: -- take care of it.
11         THE WITNESS: That's true.
12  BY MR. CHEBAT:
13  Q. Thank you.
14         Did you ever meet with the plaintiff before
15  making the investment?
16  A. No.
17  Q. Did you sign any promissory note?
18  A. No.
19  Q. Did you provide a template promissory note with
20  your signature affixed?
21  A. No.
22  Q. When Brian Colvin was representing to you that he
23  would facilitate and with your permission he was brought on
24  to help fundraise, did he ever represent to you that he was
25  a registered broker-dealer with the Securities and Exchange

Page 112

1   Commission?
2   A. No.
3   Q. And are you?
4   A. No.
5   Q. Is it your contention that you did not sign the
6   promissory note?
7   A. I didn't sign it, no. That's correct. I did not
8   sign the exact note. What would usually happen, like in
9   the case of any investment document that Stavatti does, how
10  I like to see it happen and how the procedure is, is I get
11  an idea of what kind of relationship we'll have. We put
12  the terms together on a piece of paper that I create. It
13  is then issued to the party. They execute the agreement,
14  and then I will sign it. And depending on what the deal
15  is, we may have that notarized.
16  Q. And then how long after that -- those funds hit
17  your account did you contact the bank to let them know it
18  was erroneous?
19  A. We did not contact the bank to let them know it
20  was erroneous. We accepted it as an investment.
21  Q. Absent, according to your contention, a signed
22  document from you?
23  A. Correct.
24  Q. And do you just -- is it standard process at
25  Stavatti to accept gratuitous investments?

Page 113

1   A. No. But it is standard practice upon receiving,
2   us to require and ask that that be documented. And so
3   Brian did not provide us with ample documentation.
4          The other issue that we had with this entire
5   transaction was that we never had a face-to-face meeting
6   with the investor. We were never allowed to meet the
7   individual and a variety of excuses were made why we
8   couldn't do that.
9          And so the entire process was a very strange
10  process. It was relatively unexpected. It was not normal.
11  And the goal of any relationship like this is to actually
12  have a good, mutual relationship with the investor.
13  Usually send out a thank you letter. I wasn't even know --
14  told where to send the thank you letter. And so it was
15  very strange.
16  Q. And so just for the record, a million dollars ends
17  up in your accounts?
18  A. Well, 900- --
19  Q. Or --
20         MR. DUNMIRE: 900,000.
21  BY MR. CHEBAT:
22  Q. For the record, hundreds of thousands --
23  A. Yes.
24  Q. -- and approximately a million dollars ends up in
25  your account?



Page 114

1    MR. DUNMIRE: Objection.
2  BY MR. CHEBAT:
3    Q. For the record --
4    A. Money.
5    Q. -- hundreds of thousands of dollars end up in your
6  corporate accounts, and you did not contact the bank to let
7  them know it was in error. Correct?
8    A. We did not believe it was an error. We took it as
9  an investment. However, it was an investment by an
10 individual who had mismanaged the process of having an
11 investment come into the company and also prevented us from
12 engaging the investor.
13   Q. It is Brian Colvin's contention that he reached
14 out to you in advance in writing for approval on the terms
15 of this note, this note being the note that was entered
16 into with my client. Is that correct?
17   MR. DUNMIRE: Objection.
18   THE WITNESS: The -- the terms of the note as
19 it was presented to me and the actual terms of the note --
20 and this is where things get really irritating to us. We
21 were never provided with the final version of the note
22 until our accounting service, Bonadio, demanded it from
23 Brian. And this was probably in August or September of, I
24 think, 2022. So we didn't see a final copy. We had -- I
25 had a version of an investment agreement that I believe was

Page 115

1  presented to Mr. Dimitrov that I had approved as a working
2  term sheet.
3        From the time that that working term sheet
4  was put together to the final term sheet, there's -- there
5  were changes made that I did not approve, that we did not
6  review that Brian Colvin never presented to our board of
7  directors. And so Brian went off and put together an
8  agreement. And under our assumption that he was working on
9  the original term sheet, we would accept those terms.
10       However, I would have been responsible for
11 signing off on something. And this is the challenge that
12 we faced in working with Brian. He failed to provide us
13 with final documentation. He failed to provide us with a
14 face to face or tabletop meeting with Mr. Dimitrov. He
15 failed to facilitate a relationship.
16       This was even the case with Rudy Chacon. I
17 had never met Rudy in person. I hadn't met Rudy in person.
18 Never even talked to him on the phone. Never talked to
19 Mr. Dimitrov on the phone.
20       So Brian was engaging in activities where
21 he's keeping information and contacts very close to the
22 vest. So he had a network of individuals who he claimed
23 were lenders or investors that Stavatti was not introduced
24 to.
25       And I -- you know, we didn't have an

Page 116

1  opportunity to actually sign a letter, sign an agreement.
2        He was out doing rogue activities. The
3  understanding that we at the time believed was, okay, so he
4  will bring forth these investors. And then at some point
5  in the near future, we will have a meeting with these
6  people. We will actually have agreements that will reflect
7  what the original agreements were.
8        But even in the case of our, you know,
9  proposed Regulation D offering for the Super Fulcrum
10 project, there were very specific documents that I had
11 prepared that say: This is your subscription agreement.
12 This is the nondisclosure agreement. This is the
13 shareholder agreement. These different documents need to
14 be executed and properly exchanged between Stavatti and
15 myself. And the challenge is Brian failed to follow that
16 process.
17 BY MR. CHEBAT:
18   Q. And when did you find out that Brian had failed to
19 follow that process?
20   A. The day that the investment was made.
21   Q. Did you take any action to reprimand him?
22   A. Yes. We sure did. We announced to Brian, "Brian,
23 you cannot do this. You need to provide us with the
24 information of who these people are, why they're doing
25 this. What the terms are." And so we harangued him.

Page 117

1    Q. And around what date was that?
2    A. That was probably in, you know, towards February,
3  February-March time frame of 2022.
4    Q. And was Brian able to receive other investments
5  from third parties other than my client for Stavatti's
6  benefit?
7    A. He received about ten under this program, this
8  initiative. Ten.
9    Q. Ten individuals?
10   A. Ten individuals.
11   Q. What was the aggregate value of those ten
12 individuals who --
13   A. Both.
14   Q. -- invested?
15   A. Roughly $1.2 million. Well, I should back up
16 there. Of that, Stavatti received about a million dollars.
17 Brian's claim is that there was 1.2 million. $2 million --
18 not 2 million. $200,000 was not received by Stavatti
19 Aerospace. It went to another account.
20   Q. And so it sounds like you were pretty frustrated
21 with him.
22       Is that -- is that fair to say?
23   A. We were pretty frustrated with Brian, yeah.
24   Q. And then how did things transpire kind of
25 subsequent to that? How would you describe the



Page 118

1  relationship with Brian after that?
2     A.  Well, so the relationship with Brian -- Brian was
3  attempting to assist us in our relationship with DelMorgan.
4  He was attempting to relate -- assist us with other
5  business development.
6        And at some point, Brian had announced that
7  he had a relationship with a party that was doing
8  business -- that wanted to do business in Ukraine.  They
9  wanted to sell U.S. defense products, and they wanted to
10 meet with the State Department, and because Stavatti has
11 State Department registrations, we should all go to
12 Washington, D.C., to meet with these people.  So we did.
13       I later discovered that these people were
14 probably -- I wouldn't call them mercenaries exactly, but
15 they were individuals who did not have the credentials to
16 do defense work, and they were proposing improbable sales
17 activities like the sale of F-15s from Israel to Ukraine.
18 Things that would never happen.
19    Q.  Sure.
20    A.  And so my advice was that these things will not
21 happen.  We cannot have anything to do with these
22 organizations.  And following that, Brian -- there was a
23 meeting arranged with executive directors of the State
24 Department.  We had these meetings.  It allowed me to clear
25 the air and state that we're not doing business in this

Page 119

1  manner.  We're doing business in the appropriate manner.
2        And it then -- I used that as an opportunity
3  to develop, further develop, our relationship with the
4  director of defense trade controls and our expert
5  licensing.
6        At that point, he introduced us to a husband
7  and wife couple, Joe Dacio and (phonetic) his wife Linda.
8  And the overall intent was to use them as a government
9  relations group.  I was later told by other people that we
10 have that these were probably individuals who weren't
11 working for the benefit of Stavatti, but actually trying to
12 just stonewall us.  They had made claims that they knew
13 certain generals, certain individuals who would be very
14 effective in helping us advance our company.  They claimed
15 they knew people who had connections to venture capital.
16       At the end of the day, people on our board of
17 directors such as Admiral Moore stated: Well, I know the
18 people that they are talking about.  And actually I was the
19 commanding officer of General Such-and-Such in my coalition
20 force days.  And if we want a meeting with this person, we
21 can set it up ourselves.  We don't need Joe and Linda's
22 help.
23    Q.  Sorry.  Not to cut you off.
24    A.  Sure.
25    Q.  I know it's been a long -- what's -- what's rough

Page 120

1  time estimate around this?
2     A.  This is all between March of 2022 and ultimately
3  in September of '22.
4     Q.  Okay.
5     A.  And so by September of 2022, we were encouraged by
6  Joe and Linda Dacio to take a protocol course with the
7  Protocol Institute of Washington, D.C.  I declined to do
8  that.  I said: It's not necessary.  It's not relevant to
9  our business.
10       Brian did take this protocol course.  And
11 between then and -- I'd say between March of 2022 and
12 September, Brian had numerous meetings that did not involve
13 me with representatives of the State Department, with
14 representatives supposedly of the Army and the Air Force.
15 I'm not sure if those meetings were ever confirmed.  He was
16 also meeting with other individuals.  We don't know who.
17       And the challenge of this is we were having
18 intense misrepresentation, not only to investors and
19 lenders, but also to the U.S. government.  And I don't know
20 if this negatively impacted things, but I was told that Joe
21 and Linda were in communications with the seventh floor,
22 the upper floor management of the State Department, and
23 everything was being cleared for us.
24       Well, I know that that's not possible because
25 I'm in charge of that sort of thing.  I'm the principal

Page 121

1  point of contact for anything we do at the State
2  Department.
3        And the feedback I was getting is that we
4  need to go through the regular licensing process and
5  nothing is being, you know, handed to us.
6        At the end of the day, we decided to
7  terminate the relationship with Joe and Linda.  That
8  termination was in October.
9     Q.  Was that relationship ever documented?
10    A.  It was.  We had an agreement with them to --
11    Q.  And who was that with?
12    A.  That was between Stavatti Aerospace and Joe and
13 Linda's company --
14    Q.  Joe and Linda?
15    A.  -- which I believe was T3 Enterprises or something
16 like that.
17       Prior -- now, the reason I bring this up and
18 focus on this is, we had a -- we had a number of alleged
19 investors who were coming out of this -- this group that
20 was excited by the idea of selling things to Ukraine, be
21 them drones, be them F-15s, be them other defense products,
22 even tying into the MiG-29 program.
23       And it seemed like what Brian was doing is
24 trying to structure these without Stavatti's direct
25 participation.  They were attempting to do things under



Page 122

1  Stavatti's license with the State Department, which is
2  illegal. And, of course, we put our foot down against it.
3         So we were building up some serious problems
4  with Brian and his misrepresentation during this period of
5  time.
6  Q. Which you discovered, you said, back in March,
7  around March, March 2022?
8  A. Which we start -- yeah, started discovering around
9  March. And so it was, you know, very simple things.
10        We have a -- we have a standard nondisclosure
11 agreement. The way the nondisclosure agreement works is
12 pretty simple. I have it prefilled out with my
13 information, but I don't sign it, and I don't date it. And
14 then we send it to whomever needs to execute it. They
15 execute it, send it back to me. I sign it, date it, send
16 it back. That's the standard process.
17        Brian had taken one of those, and he had two
18 versions of it. He had one where he would sign off on it,
19 which theoretically is okay. That's fine. He's acting as
20 a vice -- he's a vice president. Okay. But to put my
21 signature on it isn't okay.
22        The same thing with documentation. If you
23 look at the agreements, I'm a very picky, detail-oriented,
24 anal-retentive kind of person. Okay? If I put together a
25 document, it's going to be in the standard format. It's

Page 123

1  not going to have different fonts. It's not going to have
2  words misaligned with lines and stuff. I just don't do
3  that. It makes us look stupid. For these very reasons. I
4  mean, if we ever have to go to court, if we ever have to
5  document anything legally, we want to make sure that our
6  documents are proper.
7         We even implemented a process most recently
8  that everybody has to notarize it. We never want to have
9  this kind of miscommunication again with anybody. So
10 everything gets notarized. Well, that wasn't the case in
11 many of -- of all these different agreements that we saw
12 through Brian.
13        And it's, you know, been very upsetting to us
14 that Brian would not even have the courtesy of introducing
15 us to Rudy. That we had to meet Rudy as a result of this
16 litigation rather than in regular business operations.
17        And so that's -- so when you say what did
18 Brian do, I don't know what was going on in Brian's head.
19 I think this was something where he was afraid of losing
20 his role in the organization.
21 Q. And what was his role in the organization?
22 A. I think he saw, you know, his -- his -- his role
23 was kind of twofold. When we first met, he was an
24 individual who could assist in arranging money for the
25 company, raising investment capital. He also could assist

Page 124

1  in the drone business. That almost is a whole other topic.
2  But what it boils down to is, I personally am not very
3  excited by drones. You know, I like big airplanes,
4  airplanes that carry people.
5         Drones is a separate business. I've always
6  seen it as something that Stavatti really shouldn't be
7  involved in, that there are other companies that really
8  like drones, and they should focus on that world.
9         Brian said he had relationships with
10 different drone companies and that he in fact had a drone
11 company. He was connected to this Mars company and that
12 they had an operating drone business. And he wanted to
13 know if he could sell these drones under the name Stavatti.
14 Thought, well, yeah, sure. We probably should get into the
15 drone business. If Brian wants to run and manage that,
16 that's wonderful because I don't want to have anything to
17 do with it. So Brian began working in the drone field.
18 Q. What was his title at this time?
19 A. At that time we made him a vice president. He
20 wasn't the vice president of the company, but a vice
21 president with a focus on drones.
22        I believe at one point we made him like the
23 director of our drone division. Then there was the drone
24 division of Stavatti, which was unincorporated, and then
25 there's his Stavatti drone company that he formed in Nevada

Page 125

1  that we had previously discussed.
2  Q. And that was UAVS?
3  A. UAVS, correct. So that was basically his company
4  that he worked on. I had some influence of it, but the
5  question I always had was, okay, so what are we really
6  doing here. He proposed a lot of different drone projects.
7  He proposed drones that we could buy.
8         Things kind of came to a head in May of 2022,
9  I believe, when Dimitriy who was living in Ukraine came to
10 the United States. And he was here. He's moving back to
11 the U.S. He's going to be in the United States, but he was
12 going to coordinate operations in Ukraine.
13        And he said, "We really do need to sell
14 drones to Ukraine. There's a business there, and there's a
15 need.
16        "Brian, you're in charge of the drones. Tell
17 us about the drones."
18        Tells Brian -- Dimitriy about the drone
19 project. And we had a meeting at the March Air Force
20 Museum in person. Dimitriy says: Okay. You have a drone
21 project called the Scorpion.
22        Brian says: Yes, we have a Scorpion drone.
23        Says: Okay. I want to tour the factory in
24 Texas so that we can coordinate actually manufacturing and
25 delivering these drones to Ukraine. We need to do it now.



Page 126

1  They want the drones immediately.
2      Brian at that point says: That's not
3  possible.
4      Well, the question is why.
5      Well, because the drones don't exist. We
6  don't have those agreements.
7      Well, this opens up a whole number of
8  challenges for Stavatti.
9    Q. Mr. -- sorry. Once again, this is what time?
10   A. This is, say, May of 2022.
11   Q. Okay.
12   A. So we ended up ultimately discovering that Brian
13 had made a type of deal that did not necessarily involve
14 Stavatti. We were not familiar with the terms, but it was
15 some type of relationship with the Scorpion project. We
16 were uncertain of that, and so we decided, well, we're not
17 doing that project. And at the moment, we don't have any
18 drones for Ukraine, so just forget it.
19     During this time period is when things
20 started to degenerate with Brian that eventually led to a
21 situation where in October and November, we passed -- I
22 think it was in November, we passed a board resolution,
23 basically terminating Brian as an employee.
24     Other individuals in our company knew that
25 this was happening. Of course the board of directors did.

Page 127

1  We had people such as John Simon who were very upset. And
2  I believe in Brian and John Simon's disclosure, he talked
3  about his -- he discussed the visits that Joe and Linda had
4  made unexpected to our Stavatti site. So that's, you know,
5  on the record already.
6      But what it boils down to is by November of
7  2022, we had taken corporate action to have Brian removed
8  from the company and to have his Stavatti UAVS company
9  dissolved.
10     Brain was made aware of this through a
11 statement of a kinder, gentler way of letting Brian go. At
12 this time, you know, Brian is a very personable person. I
13 like Brian as a person. But the business relationship was
14 disintegrated. And so how do you in a kind and gentle
15 manner tell a person we don't want to have anything to do
16 with you anymore. So this was a challenge.
17   Q. Okay.
18   A. So we asked him to resign on the basis of a
19 conflict of interest. After that resignation happened and
20 Brian was out of the picture by December of 2012 -- I'm
21 sorry -- December of 2022, a number of issues came to
22 surface.
23     Of course by this time, we were being
24 threatened with litigation, of course, and I was responding
25 to your requests on behalf of Dimitrov. What was going on

Page 128

1  at that time, too, is we are constantly being told by Brian
2  two things. And this is kind of the greater context of the
3  situation.
4      We had engaged DelMorgan & Co as a FINRA
5  registered broker-dealer to raise money for us. You know,
6  they were to raise $35 million in support of our MiG-29
7  project.
8      The original reason we took this loan was to
9  pay for DelMorgan. They had a $100,000 fee. We paid them.
10 We paid them in four increments. Our engagement with
11 DelMorgan was on the 21st of February, 2022.
12     We -- you know, Ukraine was invaded that
13 week. I think it was on the 24th, so within two days, you
14 know, here we are. We have a proposal for the Ukraine Air
15 Force. Ukraine just got invaded. Should I continue this?
16   Q. No. I think I have a fair understanding.
17   A. Okay.
18   Q. What I think is a particular interest in order to
19 dispel, I guess, the representations in discovery that
20 Mr. Colvin has made is to have a better understanding of
21 how he came into the picture.
22     So is it correct that when he was brought on,
23 he was a vice president?
24   A. Yes. We made him a vice president so he could
25 represent Stavatti to investors. Correct.

Page 129

1    Q. Correct. And he had a letter of representation
2  that allowed him to do that?
3    A. Yes, he did.
4    Q. And that was executed by you?
5    A. That is correct.
6    Q. Okay. And in February, he solicited the funds
7  from my client?
8    A. Uh-huh.
9    Q. And it is your contention that he did so without
10 authority?
11   A. He had the authority to solicit funds, but he did
12 not have the authority to craft term sheets and develop a
13 business relationship that didn't have my purview,
14 approval, complete control and making sure that I know who
15 the investor is, what the terms are.
16     He basically had the approval to work in a
17 finder capacity, as an introducer. Closing of the
18 transaction, that was expected to be in concert with our
19 approval.
20     Furthermore, before we move forward on any
21 significant loan or significant investor, we really do need
22 to have a board of director's approval. We need to have
23 presentations to our company. And case in point, this
24 whole Kennedy loan that we're getting, we had full-blown
25 board meetings. We have copies, you know, of those

Page 130

1  meetings. We need them in the form of minutes or in the
2  form of digital recordings of the conversations. And, of
3  course, we took everything to a vote.
4        And so typically if we're going to receive a
5  large amount of capital or have a process to receive a
6  large amount of capital, we're going to vote on it. We're
7  going to pass a resolution, or at least going to be an
8  approval. And the contention we make is Brian was acting
9  in a rogue capacity, and he didn't do things per procedure.
10   Q.  Do you acknowledge that you -- that you
11  corresponded with Mr. Colvin in mid February via e-mail
12  where he sent you a message discussing the parameters, if
13  you will, of an agreement?
14   A.  I acknowledge that I've had numerous e-mail
15  exchanges with Brian. And I was just looking through them
16  today. I mean, we exchanged e-mails on a daily basis. I
17  will state that typically -- and if you look through my
18  e-mail history going all the way back to the beginning of
19  my first e-mail accounts, I'm a very verbose person. If
20  you get me to write something in under three sentences,
21  good luck. Usually I write paragraphs.
22        And so I've seen some correspondence that
23  does not have the flavor of a Chris Beskar e-mail. I will
24  state that I am very involved in any negotiations and, like
25  I said, with the Kennedy loan, it took us nine months to go

Page 131

1  through this whole process.
2   Q.  Sure.
3   A.  If Brian is proposing specific terms that I don't
4  find are reasonable, I'm going to counter them and just
5  say, Hey, you know, if this guy is proposing a 20 percent
6  interest rate, well, we really should bring that down to
7  eight. So tell us how we can do that.
8   Q.  So I'd like to read into the record an e-mail from
9  Brian Colvin to you, and the e-mail is from
10  Brian.Colvin@Stavatti.com.
11        Would you acknowledge that is Brian Colvin's
12  Stavatti e-mail?
13   A.  That's his Stavatti e-mail.
14        MR. DUNMIRE: Objection.
15        You can answer. I'm objecting because we
16  don't know if this is a real e-mail.
17  BY MR. CHEBAT:
18   Q.  What was Brian's e-mail address at Stavatti?
19   A.  I believe it was brian.colvin@stavatti.com.
20   Q.  And what is your e-mail address?
21   A.  Chris.beskar@stavatti.com.
22   Q.  So I'm going to read into the record an e-mail
23  that came from Brian Colvin to --
24        MR. DUNMIRE: In response to discovery
25  request. Right?

Page 132

1        MR. CHEBAT: And this was for -- yes, and we
2  can also have the record reflect that counsel Nino Abate
3  provided this in an untimely manner for this deposition.
4        MR. DUNMIRE: Last night to counsel for
5  Plaintiff, not including to me. And so the first time
6  I've -- I've seen that e-mail was -- was this morning. And
7  this is the -- this is the e-mail that Brian purports to be
8  a real e-mail that you're going to read into the record?
9  BY MR. CHEBAT:
10   Q.  Correct. It says: Dear Chris, the funding that
11  is coming in will be structured as follows: Stavatti UAVS
12  will provide capital under the original agreement formed as
13  of April 2021.
14        And there's a section called Structure.
15   A.  Okay.
16   Q.  Within it, number 1. SUAVS will bring capital and
17  receive equity as outlined in agreement fining an equity
18  schedule of Stavatti Aerospace, LTD, and PPO project
19  equity.
20        Number 2. SAUVS investors will receive a
21  predetermined senior amount of profit participation
22  equaling 10 times -- or as it's written here -- 10 X profit
23  participation, total from the PPO disbursement. Note:
24  This disbursement will be split equally 5 X to investor and
25  5 X to Superior, Inc., and/or its assigns.

Page 133

1        Number 3. Once the 10 X is paid, the
2  remaining equity profit participation payments will revert
3  wholly to SUAVS and/or its assigns. Agreements to be
4  generated.
5        Number 1, Subscription agreement from SAUVS
6  and/or its assigns.
7        Number 2, 5 X promissory note to investor.
8        And number 3, 5 X promissory note to
9  Superior, Inc., and/or its assigns.
10        Kindest regards, Brian D. Colvin, Executive
11  VP of Stavatti Aerospace, LTD.
12        In response to that, an e-mail was received
13  from chris.beskar@stavatti.com to brian.colvin@stavatti.com
14  that states --
15        MR. DUNMIRE: Objection, by the way. I'm
16  objecting to an e-mail that came in from Chris. That's
17  something that Brian purports to have happened.
18  BY MR. CHEBAT:
19   Q.  The production from Mr. Colvin seemingly
20  demonstrates an e-mail that's come in from -- that was sent
21  from chris.beskar@stavatti.com, which we previously
22  acknowledged to be your e-mail address, and Brian.colvin --
23  to brian.colvin@stavatti.com, which we previously
24  acknowledged is Brian Colvin's e-mail.
25   A.  Correct.



Page 134

1  Q. It says: Dear Brian, thank you. This looks good
2  to me. Best regards, Chris.
3  A. Do you want me to comment on that?
4  Q. I -- I would -- do you --
5  A. If I received that e-mail today from Brian, he
6  would have gotten a five-paragraph dissertation on 10 X
7  will not work. So the probability that I responded in that
8  matter is close to zero.
9  Q. So you --
10  A. I -- I have -- I don't remember responding in that
11  manner.
12  Q. So you don't recall. Okay.
13  A. Furthermore, I think an e-mail like that with a
14  proposed statement of that would have been sent not just by
15  me. It would've been copied to our board of directors and
16  other key people, including Bill Mcewen, and Bill Mcewen's
17  feedback probably would have been, you know: You've got to
18  change these terms, Brian. You know, we need to have -- we
19  need to have a sit-down discussion of what the actual terms
20  are going to be.
21      So it's -- it's -- I don't -- I don't recall
22  replying in that manner, and it's irregular.
23  Q. You previously kind of discussed a dwindling of
24  the relationship with Mr. Colvin after you, as you put it,
25  contend that he went rogue.

Page 135

1  A. Uh-huh.
2  Q. And you came to know that or you came to discover
3  that as you allege that he had gone rogue in March.
4  Correct?
5  A. Yeah.
6  Q. In March of 2022?
7  A. 2022.
8  Q. And at that point, he had already raised funds on
9  behalf of the Stavatti enterprise. Correct?
10  A. Correct. He had raised funds, and we had already
11  engaged DelMorgan.
12  Q. Okay. And was there any subsequent agreement with
13  Mr. Col- -- Mr. Colvin pertaining to his role at Stavatti?
14  A. Well, there was. He -- you know, he had been
15  representing himself as a president of the company. That
16  was the result of the seed planted by a gentleman who was
17  working briefly with us, Anthony Husini (phonetic), who
18  suggested: Oh, Brian would make a great president.
19      And, you know, my comment on that was: Well,
20  I don't know. We'll have to see. And Brian began
21  representing himself as the president.
22      Of course, this was -- it -- it's a little
23  bit of a challenge because he was president of Stavatti
24  UAVS. So in a way, you know, he could present himself as a
25  president, but it's a question of who's he presenting, you

Page 136

1  know, what is -- what organization is he president of?
2  Okay.
3      Well, ultimately, the action that was taken
4  was to propose to Brian: Hey, we'll make you a deputy
5  president, which was sort of a -- you know, it was kind of
6  a -- a joke position.
7      And the moment we announced Brian will be
8  deputy president of Stavatti, Bill Mcewen said: Well, I
9  want to be deputy CEO. You know, so it became kind of the
10  internal company joke.
11      And so for a period of time Brian was put in
12  position of deputy vice president. This was, of course,
13  later dissolved entirely, and we've eliminated the entire
14  concept of having a deputy president, vice president,
15  deputy, whatever it was, back in November.
16      But, you know, the -- the challenge with
17  Brian is he had many different representations of different
18  potential financial transactions that could be for the
19  benefit of Stavatti.
20      In the middle of all this, we have DelMorgan,
21  which was in engaged. And part of the -- the situation
22  with DelMorgan is we brought them in as a registered
23  broker-dealer. This is a professional company, I've
24  physically been to their office. They're in existence
25  today. They're in business. They were brought in to raise

Page 137

1  money for us in the right way as a FINRA registered dealer.
2      If you look through their presentation, the
3  one they proposed to us, and we've been engaged in
4  relations -- we've been approached by DelMorgan twice. We
5  were first approached by DelMorgan, I bet, 2020. They
6  wanted a $250,000 up-front fee, and they were going to
7  represent us. We declined that.
8      In 2022 they came back. They said: We -- we
9  really like your project. We'd like to represent you.
10      I met with them on Christmas Eve through a
11  gentleman named Sayid Kasmi (phonetic). And we had a
12  number of people at that meeting where we initially met
13  with DelMorgan, and we decided on Christmas Eve, hey, this
14  might be a really good approach for Stavatti, but we're
15  going to have to raise the money to engage them. We did
16  engage them.
17  Q. Mr. Beskar, what titles did Mr. Colvin hold at any
18  time --
19  A. He --
20  Q. -- while working with Stavatti?
21      MR. DUNMIRE: Objection, by the way. I think
22  it would be appropriate if you allow him to complete his
23  answer to the question.
24      THE WITNESS: Well --
25      MR. DUNMIRE: But it's your deposition. I

Page 162

1  additional counter credit of $100,000?
2  A.  Yes. I believe we did, yes.
3  Q.  Are you aware that it is Brian Colvin's contention
4  that he deposited those funds into those accounts?
5  A.  That's what I understand, yes.
6  Q.  And you acknowledge receipt of those funds?
7  A.  Yes.
8  Q.  Well, once those funds were received, did you
9  reach out to the Plaintiff at all?
10  A.  I attempted to. I had asked Brian to contact him.
11  Q.  And what did Brian do when you asked to be put in
12  contact with?
13  A.  He did not contact Dimitrov on our behalf. He
14  didn't -- he didn't have a conference call. He didn't
15  arrange for any meetings. As a matter of fact, I had even
16  traveled to Las Vegas at different times on business, and I
17  had asked, Brian: Hey, we're in the area. Doesn't
18  Dimitrov live in Las Vegas? Should we set up a meeting and
19  say hello?
20      And he did not accommodate such request.
21  Q.  When was the first time you had any correspondence
22  with the Plaintiff?
23  A.  Probably through the lawsuit. I think through
24  your --
25  Q.  Through the precede -- through the demand letter

Page 163

1  that preceded the lawsuit?
2  A.  Yeah. Yeah. The only -- the only point of
3  contact that Stavatti had with Valentino Dimitrov that I
4  was in communication or anyone else did was Brian Colvin.
5  Q.  So am I correct in saying that before today, you
6  had never even spoken to him?
7  A.  I had not spoken with him. Didn't know who he
8  was.
9  Q.  You had only engaged with him through his counsel
10  that being --
11  A.  That being you.
12  Q.  Correct.
13  A.  Didn't have his phone number. As a matter of
14  fact, I don't think I got his phone number until
15  Brian Colvin surrendered the promissory note that -- under
16  Bonadio's request to do an audited financial statement.
17  Q.  Which had it on it?
18  A.  Which had it on it, correct.
19  Q.  Once the funds were received, other than the
20  remittance to DelMorgan, which you expressed was the need
21  for those funds -- for those funds in your letter --
22  A.  Uh-huh.
23  Q.  -- what else was the money used for?
24  A.  To pay off some of these debts associated with
25  9400 Porter Road. We used it to engage the services of

Page 164

1  T3 Enterprises, general business operating expenses
2  associated with that.
3      I think at some point I provided a list. I
4  mean, it's within that -- our bank statement reflects where
5  money went in that time period. So...
6  Q.  Sure. And you can confirm that John Simon has
7  signature authority over the Stavatti Niagara account.
8  Correct?
9  A.  Correct. And so a certain portion of funds would
10  be transferred to that, and they would be spent on the
11  expenses associated with 9400 Porter Road.
12  Q.  Does anybody other than yourself have signature
13  authority over that -- over the primary account, the 7316
14  account?
15  A.  No.
16  Q.  Does that include your wife?
17  A.  She has no signatory authority over any Stavatti
18  accounts.
19  Q.  In reviewing the cap table, a particular
20  shareholder was of interest just given the amount of equity
21  he purportedly has, that being David Wilcock.
22  A.  Uh-huh.
23  Q.  How does Mr. Wilcock acquire that many shares in
24  Stavatti Enterprises?
25  A.  David was one of our founding shareholders. David

Page 165

1  came in to Stavatti initially as a friend of mine, a
2  contact from way back in the 2010 era. He had invested in
3  the Stavatti Industries initially and was instrumental in
4  assisting Stavatti Aerospace of Minnesota.
5      When we came to form Stavatti Aerospace of
6  Wyoming, he was a founding shareholder. And he helped
7  capitalize the company with an investment that now totals
8  roughly $2 million. And so he actually put up the -- the
9  funding for us to acquire 9400 Porter Road. And so that's
10  basically how he came in as an early stage founding
11  shareholder.
12  Q.  Was there any acquisition of any intellectual
13  property from Mr. Wilcock?
14  A.  No. Other than as a shareholder of the company.
15  So he owns, you know, the intellectual property that's, you
16  know, commensurate to his ownership stake in the company.
17  But there was no acquisition of intellectual property per
18  se.
19  Q.  I just want to -- I'm going to rephrase my
20  question.
21  A.  Okay.
22  Q.  Did Mr. Wilcock have a company that you sought to
23  acquire the intellectual property assets of at any point?
24  A.  No. No.
25  Q.  Okay. Can you list all of the employees of



Page 166

1  Stavatti?
2  A.  All of the --
3       MR. DUNMIRE:  Objection.  Asked and answered
4  ad nauseam.
5       MR. CHEBAT:  I believe we asked John Simon
6  that question, but I'd like to ask --
7       MR. DUNMIRE:  He asked Stavatti what?
8       MR. CHEBAT:  Of the Stavatti entities.
9       MR. DUNMIRE:  Like I say, you've been over
10 that in great detail.  Great detail.
11 BY MR. CHEBAT:
12 Q.  I'd like to share with you the upgrade for MiG-29
13 Fulcrum Fighter Aircraft Confidential Private Placement
14 Memorandum.
15 A.  Uh-huh.
16 Q.  Is that a document that you're familiar with?
17 A.  Yes.
18 Q.  And is that a document that you oversaw the
19 creation of?
20 A.  Yes, I created it.  That's one of the early
21 drafts, but, yes.
22      MR. DUNMIRE:  If I might help.  That document
23 was to be used with DelMorgan.
24      THE WITNESS:  Yeah.  It was created to give
25 DelMorgan a template to -- the -- to go forth and use this

Page 167

1  to do a private placement.
2       MR. CHEBAT:  Sure.
3       THE WITNESS:  That was the mission.
4  BY MR. CHEBAT:
5  Q.  In 2022, how many employees did Stavatti have?
6  A.  Well, if you define employees as the SBA does as
7  people who put more than 40 hours of work into a company
8  per month, we roughly had probably 30 to 40 people working
9  on Stavatti.  I mean, right now if you go through our
10 roster of people who are committed to this project who are
11 either shareholders, stakeholders, or people who plan on
12 receiving compensation when we go into production, we've
13 got over 100 people.  Probably just under 130.
14      So at that time, we had about 100 people
15 involved in this project on different levels, either in
16 their leadership, they're out there promoting the company,
17 they're doing some engineering support, they're doing work
18 on a volunteer basis, or they own stock.
19      And they've been compensated with stock, you
20 know, some of them, like John Simon, for instance.  And,
21 you know, they're all very excited supporters.
22 Q.  How many W-2 wage earners were employed by
23 Stavatti in 2022?
24 A.  Zero.
25 Q.  And how many W-2 wage earners were employed by

Page 168

1  Stavatti in 2023?
2  A.  Zero.
3  Q.  And how many W-2 wage earners were employed by
4  Stavatti in 2024?
5  A.  Zero.
6  Q.  Are you aware that for each one of those
7  respective years, the numbers that you have set here on the
8  direct and under direct employment for 2022 read 54?
9  A.  Uh-huh.
10 Q.  Under 2023, 176?
11 A.  Uh-huh.
12 Q.  And under 2024, 229?
13 A.  Yes.  Those are our projected employment levels if
14 the program is capitalized and funded.
15      MR. DUNMIRE:  Can I ask you where that's
16 coming from?
17      MR. CHEBAT:  That is on the Exhibit C.  The
18 private placement memorandum pertaining to --
19      MR. DUNMIRE:  The Super Fulcrum?
20      MR. CHEBAT:  No.  This one's a different one,
21 Terry.  It's --
22      MR. DUNMIRE:  The only one attached to the
23 complaint was the Super Fulcrum.
24      MR. CHEBAT:  This one's MiG-29 Fulcrum
25 fighter aircraft.

Page 169

1       THE WITNESS:  Oh, oh, I see it.
2       MR. CHEBAT:  Super Fulcrum.
3       MR. DUNMIRE:  Yeah.  Okay.
4       THE WITNESS:  Yeah, those are projections.
5  BY MR. CHEBAT:
6  Q.  And so given your testimony prior, based -- if the
7  definition of an employee is somebody who's a wage earner
8  at the organization, there were no employees.  Correct?
9  A.  If you use that definition as opposed to the SBA
10 definition, correct.
11 Q.  Correct.  Thank you.
12 A.  Did you --
13 Q.  Can you --
14 A.  I don't know if I can ask you questions or not.
15 Q.  I'm okay with you asking me a question.  It's
16 quite unconventional, but go on.
17 A.  Well, I was wondering if you or the Plaintiff ever
18 received the message from the Ukrainian military attache
19 that states we -- you know, basically paraphrasing:  When
20 you have your prototype, we will issue you a contract.
21 Which is pertinent to this.
22      Because the whole situation with Ukraine is
23 very straightforward.  Ukrainian Ministry of Defense, in an
24 effort to not be considered a corrupt entity, which is a
25 big issue with Ukraine -- corruption's a big problem --



Page 182

1  universe with the exception of Brian Colvin, it exists.
2          And if you note, there are pitch decks
3  written before that edition and pitch decks thereafter.
4  And that was the only instance in the history of Stavatti
5  that he's got a pitch deck with his name on it.
6      Q.  So it was done sort of a cover your ass sort of
7  deal for the company?
8      A.  Correct.
9      Q.  Okay.  Thank you.
10         And that was the same with the business card
11  and so forth?
12     A.  Correct.  Yeah.  He also has a set of business
13  cards that don't indicate he's president.
14     Q.  All right.  So George Chebat was asking you about,
15  were certain promissory notes executed, and he read a
16  number of them, which if I'm not mistaken were promissory
17  notes that were generated through people that Rudy brought
18  to the table and with Brian.
19     A.  Uh-huh.
20     Q.  And I think you answered yes to the question of
21  those being executed promissory notes.  I just want to, I
22  think, have you clarify whether you think the promissory
23  notes that had the facsimile --
24     A.  Uh-huh.
25     Q.  -- of your signature that you did not sign are

Page 183

1  considered an executed promissory note?
2      A.  They were not executed by me.
3      Q.  Or authorized by you?
4      A.  Or authorized by me.
5      Q.  Okay.  So if you said, yes, they were executed,
6  that was misspeaking?
7      A.  They were -- it was misspeaking on my part as far
8  as did I -- did I personally execute them and did I
9  personally approve them and were they accepted to the
10  board.
11         Now, am I -- we've accepted the money.  We
12  received the money.  We acknowledge that these people
13  invested in Stavatti.  So our purpose is to make those
14  people whole.
15     Q.  Okay.  Thank you.
16         Did -- and a little repetitive, I suppose.
17         Did you ever authorize Brian to use a
18  facsimile signature bearing your name on promissory notes
19  to be filled out by Brian?
20     A.  No.
21     Q.  You know, this February 15th e-mail that just
22  came, I first saw it this morning, and you read it into the
23  record.
24     A.  Uh-huh.
25     Q.  We heard your testimony about that.  You were very

Page 184

1  skeptical about whether or not they were real.
2          But if it -- if those were real e-mails, what
3  would have you expected to follow on -- on that e-mail
4  from -- from Brian?
5      MR. CHEBAT:  Objection.
6      THE WITNESS:  Can I answer or --
7  BY MR. DUNMIRE:
8      Q.  Yes, you can answer.
9      A.  Okay.  Well, what I would expect to be received is
10  a draft agreement, a draft term sheet that would then be
11  turned into a final term sheet.
12     Q.  Okay.  You never received anything like that?
13     A.  I never received any supporting drafts from Brian.
14     Q.  So you've spoken a number of times about the
15  Thursday meeting --
16     A.  Uh-huh.
17     Q.  -- board meetings and meetings of interested
18  parties.  Brian attended those.  Correct?
19     A.  Correct.  Brian was on many of them.
20     Q.  Many of them.  Many of them prior to the time of
21  February and the Dimitrov note?
22     A.  Yes.
23     Q.  And at those meetings, would you have expected
24  there would have been discussions of pending, prospective
25  investors?

Page 185

1      A.  Yes.
2      Q.  And did -- did Brian ever tell anybody at that --
3  on those meetings or -- or you, anything about a million
4  dollar investment from --
5      A.  He -- he would provide a very vague description of
6  potential investment.  And even when an investment had
7  happened, he would speak in very general, nonspecific
8  terms.
9      Q.  It seemed like he was concealing things from
10  everybody?
11     A.  Yes.  He was not openly stating that this person
12  with this address, you know, invested X and these are the
13  terms of the agreement, and I will be sending you the
14  promissory notes and the supporting evidence with
15  supporting details on Tuesday, you know, that sort of
16  thing.  No follow-up.
17     Q.  So you provided Brian at some point in June, I
18  think it was, some cover for the idea that he was
19  president.  Correct?
20     A.  Uh-huh.  Correct.
21     Q.  Had there been ever anything like that provided to
22  him prior to that?
23     A.  No.
24     Q.  And at the time he was -- Brian was dealing with
25  Rudy Chacon with all those investors, including Dimitrov,



Griffin Group International
888.529.9990 | 602.264.2230

Page 202

1  Q.  And is there -- are there any anticipated plans to
2  create an entity in Greece at this time?
3  A.  There might be.
4       MR. CHEBAT:  We reserve our right to continue
5  this deposition within the rules.
6       Terry?
7       MR. DUNMIRE:  Well, I have a follow-up
8  question on what you asked.
9       But what right to continue it?  What do you
10 mean continue it?
11      MR. CHEBAT:  Just a rights of reservation,
12 Terry.
13      MR. DUNMIRE:  I'm not familiar with it.  You
14 know, I think when we come to the end of this deposition,
15 that would be the end of the deposition as far as I'm
16 concerned.  So if there's something I don't know, I guess
17 I'll learn.  I can't tell you to take it back, because I
18 don't know really what it means or if it has any effect.
19 But I -- my understanding is when a deposition is done here
20 today, it will be done.
21
22           FURTHER EXAMINATION
23 BY MR. DUNMIRE:
24  Q.  So the March 31st, 2022, e-mail that George just
25 provided to you, which was apparently a summary of

Page 203

1  investments that Brian had brought in, totaling a million 2
2  or so, most of it blanked out, so that was a month and a
3  half after the investment by Dimitrov.
4       Had you received anything from Brian before
5  that e-mail --
6  A.  No.
7  Q.  -- to specify this million 2?  Or even during that
8  time and even at that date, March 31st, 2022, I think your
9  testimony has been you saw none of the investment documents
10 that pertain to money he had raised.  Correct?
11 A.  Correct.  Well, what -- I mean, I remember that
12 document very clearly, and it's an important document to me
13 because it's the only official summary of the total amount
14 invested.
15      And to get that document was pulling teeth.
16 I had told Brian:  You know, we need to know how much money
17 has been raised and, you know, where it came from and who
18 these people are.  Because we need to know -- you know, we
19 had this money show up in our account.  And 10,000 was here
20 on this day and at this time, and another 25,000 here, and
21 here's the 900,000, so on, so forth.  We need to know who
22 sent it, when, who they are, and all their information.  So
23 give us a spreadsheet or something.
24      So he put together this little spreadsheet.
25 And if you look at it, it is just this one cell essentially

Page 204

1  with, you know, his names.  And I even think there's a list
2  of his -- his cut or whatever and -- and for UAVS, what
3  have you, and the name and the amount and supposedly the
4  date.
5       And we used this for all of our -- that was
6  our sum total of, you know, information about these folks.
7  It didn't come with the investment agreements.  And so --
8  Q.  And everybody but Dimitrov was blanked out.  Is
9  that right?
10 A.  Well, like, he would -- he might have their name.
11 But then, you know, we don't have any follow-up information
12 on the -- who they are, what the agreement was.
13 Q.  But if I saw that, if I remember that document
14 correctly --
15 A.  Uh-huh.
16 Q.  -- the only name that wasn't blanked out was
17 Dimitrov?
18 A.  Maybe.  Yeah.
19 Q.  And all the others were blank?
20 A.  Yeah.
21 Q.  So you didn't even get the names of the other
22 people?
23      MR. CHEBAT:  Objection.  Terry, they've been
24 redacted by -- they've been redacted by counsel.  Not --
25 they weren't redacted at the time.

Page 205

1       MR. DUNMIRE:  Oh.
2       MR. CHEBAT:  They were redacted by Nino prior
3  to circulating it.
4       THE WITNESS:  Yeah.  The names are in the
5  spreadsheet.
6       MR. CHEBAT:  The names are in the
7  spreadsheet, yeah.
8       MR. DUNMIRE:  I see.
9  BY MR. DUNMIRE:
10 Q.  And when he disclosed that, did he specify that he
11 redacted them himself after the fact?  Okay.
12      And your recollection of that document was
13 that it showed that Nino -- that Brian had took a cut of
14 all these investments?
15 A.  I -- I don't remember exactly, but I think it gave
16 the total amount, and then the amount total amount that was
17 assigned to Brian, because it said 1.24 some-million
18 dollars.  Well, out of that $1.24 million, Stavatti didn't
19 receive 1.2, whatever the number was.  We received about
20 $200,000 less than that.
21 Q.  Okay.
22      MR. DUNMIRE:  So that's all I have.
23      MR. CHEBAT:  We're going to go off the
24 record.
25 ...

