Exhibit 74-1

# AFFIDAVIT OF BRIAN COLVIN

STATE OF ARIZONA   )
                   ) ss.
County of Maricopa )

Affiant BRIAN COLVIN, deposes and states as follows:

1. I am a named Defendant in the lawsuit filed by Plaintiff in Arizona District Court, Cause No. 2:23-CV-00226-DJH ("Lawsuit"). As such, I am familiar with the subject matter.

2. In 2018, I started an unmanned drone business.

3. On or about February 2020, I met Defendant Christopher Beskar ("Beskar"), the CEO and Founder of Defendants Stavatti Aerospace, including Stavatti Aerospace Ltd, a Wyoming C corporation (collectively, "Stavatti"). Beskar and I discussed our mutual interest in my unmanned drone business and the desire to do business together.

4. In April of 2020, Beskar officially appointed me as the Vice President For Unpiloted Autonomous Systems (UAS) and Director of Stavatti UAS for Stavatti.

5. On March 29, 2021, pursuant to my agreement with Beskar, I formed Stavatti UAVS, Inc., a Nevada corporation ("Stavatti UAVS"), which was owned by me but was affiliated with Stavatti's UAS division.

6. As Vice President of Stavatti's UAS division, the scope of my duties was limited to operating and growing Stavatti UAS. I received no compensation for being Vice President of Stavatti's UAS division. Instead, the agreement with Beskar was to split the profits from Stavatti UAS, if any.

7. After forming Stavatti UAS, I obtained my certification as a Protocol Officer, a United States State Department designation that allowed me to engage with the State Department and diplomatic delegations from other countries, promoting and soliciting contracts for Stavatti UAS. To perform my duties as Vice President of Stavatti UAS, I was required to travel periodically to Washington, D.C., to meet with potential buyers of Stavatti UAS's military-grade drone products.

Document ID: ee57f6597205d9d5a15e617689d1c075b85037e6f6cceb01d6afe5c594f9324a

8.      On or about November, 2021, Beskar asked me to help secure funding for Stavatti's MiG-29 upgrade program ("MIG Program"), which was a program to purchase and upgrade military aircraft for Allied Countries. This was outside of my normal scope of duties as Vice President of Stavatti's UAS division, but I understood Beskar was making a big push for this program, so I agreed to do what I could. I eventually recruited DelMorgan Group LLC ("DelMorgan"), an investment banking firm with offices in Santa Monica, California, which said they could raise at least $130 million through a private placement offering.

9.      Beskar also wanted to find private lenders who would make bridge loans to Stavatti while DelMorgan was doing its capital raise. I told Beskar that Rudy Chacon ("Chacon"), a friend of mine who had a lot of good contacts, had offered to assist with finding suitable private lenders for the bridge loans.

10.     On or around January, 2022, I told Beskar that Chacon had identified Plaintiff as a suitable private lender who could make a bridge loan to Stavatti. Chacon told me specifically that Chacon was a multi-millionaire and a sophisticated businessman.

11.     On February 10, 2022, Beskar retained DelMorgan. Also, on or about February 10, 2022, Beskar and I signed the "Stavatti Term Sheet for Asset Backed Loan" for a proposed bridge loan to Stavatti ("Term Sheet"). The Term Sheet expressly provides that the "terms and conditions under which any loan would be provided are subject to change, *and this Term Sheet does not constitute an offer to purchase or sell securities*."

12.     On or about February 28, 2022, Chacon obtained a signed "Stavatti Aerospace, Ltd Promissory Note" ("Note") from Plaintiff for a bridge loan to Stavatti in the amount of $1 million ("Bridge Loan").

13.     Contrary to Beskar's allegation, I did not "cut and paste" his signature on the Note. Instead, Beskar emailed me with a promissory note that included Beskar's signature, with the instructions to use the signed promissory note to "revise as needed" for any potential private lender. Moreover, contrary to Beskar's false allegations, a copy of the Note in its final form was emailed to Beskar for approval, which he approved, before Plaintiff signed it.

14.     In April, 2022, Plaintiff funded his Bridge Loan in the amount of $1 million to Stavatti. At the time Plaintiff funded the Bridge Note, I called

Beskar to advise him that the money was deposited in Stavatti's bank account and that $100,000, as agreed, was deposited into the bank account of Stavatti UAVS to fund its operations. Beskar replied by thanking me for a great job.

15.     In June, 2022, Beskar offered to promote me to President of Stavatti Aerospace. Beskar emailed me my new business cards and pitch decks he wanted me to use. By August 2022, Beskar issued a formal Letter of Representation, confirming that he had made me the "Deputy" President of Stavatti Aerospace Ltd, a Wyoming corporation. Even though my title had changed, my primary duties continued to be operating and growing Stavatti UAS.

16.     Not long after, DelMorgan notified Stavatti that due to the Ukraine war, their investors were afraid to be seen as "funding a war" and therefore, they would not be able to pursue the private placement for the MIG Program.

17.     Over the following months, while I continued to work on securing UAS contracts with Allied Countries and support the company's success in other ways, Beskar left me to clean up the mess he had made when Stavatti could not repay several bridge loans, including the loan from the Plaintiff.

18.     On or about October 10, 2022, Stavatti received Plaintiff's demand letter.

19.     On or about December 12, 2022, I submitted my letter of resignation to Beskar.

20.     On or about December 12, 2022, I dissolved Stavatti UAVS.

21.     I understood and believed, based on the information I had at the time, that the Bridge Loan, evidenced by the Note, was not a "security" and was not subject to any state or federal securities regulations.

22.     I did not have direct contact with Plaintiff until after Plaintiff made the Bridge Loan to Stavatti. Any information that was provided to Plaintiff before he made the Bridge Loan to Stavatti was provided by Chacon. Therefore, Plaintiff could not have relied on any statement or document received from me before making the Bridge Loan.

23.     I provided the Confidential Private Placement Memorandum for the MIG Program ("PPM"), which I understand was prepared by a securities attorney retained by Beskar. Based on my review of the PPM at the time, and my discussions with Beskar and others about the same, I believed that the

information in the PPM was true and correct. I also knew that Stavatti had previously shared the PPM with financial institutions, other aviation companies, and investment bankers, including DelMorgan. None of these sophisticated recipients questioned any of the information contained in the PPM, which confirmed my belief that the information in the PPM was not false or misleading.

24. At all relevant times, I had no actual knowledge of any false or misleading information that was provided to Plaintiff or others about Stavatti. I also acted reasonably at all times to avoid providing any misinformation about Stavatti to Plaintiff or others by making sure that such information was reviewed and vetted before distribution.

25. At all relevant times, I understood and believed that because of Stavatti's valuable intellectual property, the real estate Stavatti owned in New York, and DelMorgan's pending private placement capital raise for at least $130 million, Stavatti had or would have the financial resources to pay off Plaintiff's Bridge Loan when it came due.

26. At all relevant times, Beskar was fully informed about Plaintiff's Bridge Loan to Stavatti, and all of Beskar's allegations to the contrary are demonstrably false.

27. At all relevant times, Beskar was fully informed about the deposit of Plaintiff's loan proceeds in the Stavatti bank account and about the $100,000 that was disbursed to Stavatti UAVS.

28. All the information that was provided to Plaintiff about Stavatti or the Bridge Loan, including the Term Sheet, PPM, and the Note, was provided by Beskar and/or was approved by Beskar.

29. All of Beskar's allegations that I was a "rogue" employee, that I was working in secret, and that he was not fully aware of Plaintiff's Bridge Loan at all relevant times, are a complete fiction. We had scheduled conference calls every Wednesday in addition to the numerous emails and telephonic communications that were exchanged regularly every work week. Therefore, Beskar was fully informed at all times of my activities relating to Stavatti's business.

30. When I was a "vice president" of Stavatti from April 2020 to August I operated the UAS program through Stavatti UAVS, which was a separate

Document ID: ee57f6597205d9d5a15e617689d1c075b85037e6f6cceb01d6afe5c594f9324a

company but affiliated with Stavatti. The title of "Vice President" came with no management authority outside of Stavatti UAS. During that time, all the information I had about Stavatti's organization, its finances, and its assets was provided to me by Beskar.

31. Beskar's allegations that he did not promote me to President, or that he did only after discovering that I was fraudulently using the title, are again a demonstrable lie.

32. Though I was the President of Stavatti Aerospace for a few months, I was mainly preoccupied during that time with finding a way for Stavatti to pay Plaintiff's Bridge Loan and loans from other lenders so Stavatti could avoid possible legal action.

33. As President, I did not have management authority or control over any of Stavatti's assets or bank accounts. Beskar exercised sole control over the Stavatti's assets, finances, its bank accounts, and related company information at all times.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE

DATED THIS 8th day of September, 2025.

_____
Brian Colvin

Signer ID: 7BS7MVTZ16...