**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Valentino Dimitrov, | No. CV-23-00226-PHX-DJH |
| Plaintiff, | **ORDER** |
| v. | |
| Stavatti Aerospace Limited, et al., | |
| Defendants. | |

Before the Court is a Motion for Summary Judgment filed by Defendants Stavatti Aerospace Limited[1] ("Stavatti"), Christopher Beskar ("Beskar"), John Simon, Jean Simon, William Mcewen, Patricia Mcewen, Rudy Chacon, and Jane Doe Chacon (collectively the "Moving Defendants"). (Doc. 63). Plaintiff Valentino Dimitrov ("Plaintiff") has filed a Response (Doc. 65) and Moving Defendants have filed a Reply. (Doc. 76). Moving Defendants subsequently filed a Motion to Strike Plaintiff's Response to their Motion (Doc. 66) to which Plaintiff has Responded (Doc. 67).

Also pending is Plaintiff's fully briefed Motion for Summary Judgment against Defendants Stavatti, Beskar, and Brian Colvin ("Colvin") ("Plaintiff's Motion"). (Docs. 68, 72, 74 & 77). Stavatti and Beskar filed a Response (Doc. 72) and Colvin responded separately. (Doc. 74). For reasons outlined below, all of the pending Motions

---

[1] The lawsuit was brought against not only Stavatti Aerospace Limited, but also against the company's other iterations: Stavatti Corporation, Stavatti Immobileare, Stavatti Niagara Ltd., Stavatti Super Fulcrum Ltd., Stavatti Ukraine, and Stavatti Heavy Industries Ltd. For ease, the Court will refer to all these entities as Stavatti.

are denied.

I.      **Background**

A promissory note between Plaintiff and Stavatti, its contents, and the supposed promises contained therein, spawned the current dispute.  That statement might be the only one on which all parties to this dispute agree.  Versions of events diverge between the parties after that.  The promissory note in question has both Plaintiff's signature on it and Beskar's.  Beskar is the CEO of Stavatti, an aerospace company dealing primarily with aircraft defense optimization. (Doc. 68-5, Ex. 68-5).  Plaintiff says he is an investor who invested one million dollars into Stavatti and was hoping to make a return on his investment. (Doc. 68 at 2).  Plaintiff alleges that he invested $1,000,000 cash with Stavatti Aerospace, LTD as an angel investor and entered into a Promissory Note ("Contract") with Stavatti for repayment of that investment on or before May 1, 2022. (*Id.*)

The terms of the promissory note state that Plaintiff's initial one-million-dollar loan to the company will grow to five million in 48 months' time and Plaintiff would be paid back quarterly with the principal amount to be paid back by May 1, 2022. (Doc. 68-1 (hereafter, "Promissory Note").  But things went awry after Plaintiff signed the promissory note.  Not only did his investment never multiply, but he also never received the principal amount back from Stavatti.  (Doc. 68 at 3).

Moving Defendants describe things differently. According to Moving Defendants, the promissory note was negotiated between Plaintiff and Colvin, as President of Stavatti Aerospace Ltd, with Colvin acting in his personal capacity, entirely outside the scope of his employment. (Doc. 63 at 2).  Although the promissory note has Beskar's signature on it, Beskar disavows signing it.  (Doc. 72 at 3–4).  He disavows even seeing the note until the company did an internal audit.  (*Id.* at 5–6).  He says he never met Plaintiff or spoke to him on the phone and says he handed the entire process of acquiring investments and contacting investors to Colvin.  (*Id.* at 5).

Then, there's Colvin's description of how things unfolded.  Colvin held two different jobs at Stavatti during his tenure with the company: Vice President and eventually

Deputy President. (Doc. 74 at 2 & 4). Colvin agrees that he was brought on to help Stavatti acquire funding for its projects, specifically the MiG-29 upgrade program. (*Id.* at 2). The program's goal was to purchase and upgrade military aircraft. (*Id.*) To aid in the execution of the program's goals, Colvin says he recruited an investment banking firm called DelMorgan Group LLC ("DelMorgan") based in Santa Monica, California. (*Id.*) However, according to Colvin, Beskar was ambitious and also wanted private investors to help his new project. (*Id.* at 3). Colvin says Beskar put him in contact with his friend Rudy Chacon ("Chacon"), who then identified Plaintiff as a possible investor.[2] (*Id.*) Chacon, Colvin highlights, was the man who sent him the promissory note with Plaintiff's signature on it. (*Id.*) Throughout his narrative, Colvin maintains that Beskar then emailed his own signed promissory note to Colvin and told him to make changes as necessary. (*Id.*) Colvin says Beskar was aware of all of Colvin's activities and even sent an email providing final approval of the promissory note signed between Beskar and Plaintiff. (*Id.*) Colvin believes he was promoted shortly thereafter for facilitating the signing of the promissory note and securing more funding for Beskar. (*Id.* at 4). However, Colvin's time as President of the company was short-lived because DelMorgan pulled its funding after war in Ukraine broke out. (*Id.*)

On February 3, 2023, Plaintiff filed suit against Defendants, alleging racketeering violations under federal and state law (Count One),[3] breach of contract (Count Two), fraud (Count Three), fraud in the inducement (Count Four), conversion (Count Five), breach of good faith and fair dealing (Count Six), breach of fiduciary duty (Count Seven), negligence (Count Eight), intentional misrepresentation (Count Nine), negligent misrepresentation (Count Ten), unjust enrichment (Count Eleven), tortious interference with contract (Count Twelve), and civil conspiracy (Count Thirteen). Now, Plaintiff moves for summary

---

[2] Moving Defendants dispute this and say that Rudy Chacon was a friend of Colvin's and had no prior relationship to any of the Moving Defendants. (Doc. 72 at 4).

[3] Plaintiff's Count One is titled "RICO Violation of 18 U.S.C. §§ 1961-1976" but alleges that Defendants violated A.R.S. § 13-2301, Arizona's civil racketeering statute. In its Motion for Summary Judgment, Plaintiff clarifies that it is only seeking judgment on its state RICO claim.

judgment on his breach of contract claim against Stavatti and his state law racketeering claim against Stavatti, Beskar, and Colvin. Moving Defendants seek judgment on the entirety of Plaintiff's case against them. They also seek to strike Plaintiff's untimely Response to their Motion for Summary Judgment. The Court will address this request first.

## II.     Defendants' Motion to Strike Plaintiffs' Response

Moving Defendants urge the Court to strike Plaintiff's Response to their Motion for Summary Judgment because it was untimely filed. (Doc. 66). Plaintiff responds[4] that filing the Response four days after the Court's deadline was due to excusable neglect. (Doc. 67 at 3). Specifically, Plaintiff argues that the paralegal responsible for alerting Plaintiff's counsel to deadlines in this case accidentally used Arizona Superior Court Rules rather than Federal Rules to calendar the appropriate deadlines for counsel. (*Id.*) The Court prefers to decide the dispute on the merits and will not strike Plaintiff's Response but cautions Plaintiff's counsel that it is *his* responsibility, not his staff's, to meet and calendar legal deadlines.

Under Federal Rule of Civil Procedure 6(b)(1)(B), a "court may, for good cause," extend deadlines "on motions made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. Pro. 6(b)(1)(B). It is certainly true that the Rule requires that a request for an extension of time due to excusable neglect be made via a motion. *Id.* However, the Rule also serves the purpose of "seeing that cases are tried on their merits" and not mere technicalities. *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1259 (9th Cir. 2010). "To determine whether a party's failure to meet a deadline constitutes 'excusable neglect,' courts must apply a four-factor equitable test, examining: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Id.* at 1261.

While Plaintiff's reason for the delay, a calendaring issue, is not particularly strong

---

[4] Plaintiff's Response has been filed as a Motion rather than a Response. (Doc. 67). Because Moving Defendants' Motion to Strike is being denied, Plaintiff's "Response" is moot.

because the delay was within Plaintiff's control, the other factors militate in Plaintiff's favor. From the underlying pleadings the Court cannot glean any bad faith on the part of Plaintiff. The delay, in totality, was for four days in filing a Response to Moving Defendants' Motion for Summary Judgment. And Moving Defendants do not tell the Court how the delay prejudiced them or impacted the proceedings. The four extra days in responding to Moving Defendants' Motion did not hinder the resolution of the pending motions either. Notably, Moving Defendants do not argue that they suffered any prejudice. Instead, they spend the entirety of their Motion to Strike arguing the merits of the case. (Doc. 67). The Court also prefers to resolve this case on the merits. Therefore, the Court finds excusable delay on the part of Plaintiff and Moving Defendants' Motion to Strike Plaintiff's Response to their Summary Judgment Motion is denied.

The Court will now consider the briefing on both Motions for Summary Judgment.

**III.    The Motions for Summary Judgment**

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses. Fed. R. Civ. P. 56. Summary judgment or adjudication of issues is appropriate if depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). The burden on the party moving for summary judgment depends on whether it bears the burden of proof at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *Id.* In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case. *Id.*

On the other hand, if the moving party would not bear the burden at trial, it can meet its burden on summary judgment by "either of two methods." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000). It may produce

affirmative evidence . . . negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may . . . meet its initial burden of production "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1105–06 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "A moving party may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Nissan Fire & Marine Ins.,* 210 F.3d at 1105. If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1102–03; *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire & Marine Ins.,* 210 F.3d at 1103. In this regard, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts[, but] must come forward with specific facts showing that there is a genuine dispute for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

### A.    Defendants' Motion for Summary Judgment

Moving Defendants move for summary judgment on one basis alone: that Plaintiff lacks constitutional standing to bring his claims because he is not "the party with the direct injury in fact." (Doc. 63 at 3).  Moving Defendants argue that uncontested facts show that the money Plaintiff invested into their Company was not Plaintiff's own money, but was instead money he had received from others, and as such, Plaintiff lacks the right to bring

any of his claims. (*Id.*) In Response, Plaintiff argues that he is a third-party beneficiary with a contractual right to bring his claims, and thus constitutional standing is not at issue here. (Doc. 65 at 5–6). The Court agrees with Plaintiff that factual disputes remain regarding whether he is a contractual beneficiary of the promissory note and that the issue of constitutional standing is not at issue in this dispute.

"Contractual standing is distinct from Article III standing and does not implicate subject-matter jurisdiction." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020). "Article III standing speaks to the power of a court to adjudicate a controversy; contractual standing speaks to a party's right to relief for breach of contract." *Id*. Article III constitutional standing requires the following: (1) that the plaintiff has suffered an injury in fact which is concrete and particularized; (2) a causal connection between the injury and the conduct complained about; and (3) it must be likely that the injury can be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Here, the dispute centers on a promissory note, signed by both Plaintiff and Beskar, on behalf of Stavatti. The promissory note functions as a contract between Plaintiff and Stavatti. Presently, Plaintiff has presented sufficient facts to show he is a beneficiary of the contract in question. (Doc. 65-1 at 2, Ex. A, Promissory Note). Though Defendants may ultimately prevail on this issue, whether Plaintiff is a contract beneficiary "is not a prerequisite to a court's power to adjudicate" his breach of contract claim. *SM Kid, LLC*, 963 F.3d at 211. The actual terms of a contract go to the merits of the dispute, not the Court's ability to resolve the controversy. *Id*. at 212. Plaintiff is not required to prove the scope or parameters of the promises in a contract to establish Article III standing and a merits defense about the promissory note does not defeat Article III standing. *Novartis Seeds, Inc. v. Monsanto Co.*, 190 F.3d 868, 870 (8th Cir. 1999). Moreover, genuine factual disputes regarding Plaintiff's beneficiary status precludes summary judgment in favor of Defendants. Therefore, Defendants' Motion for Summary Judgment is denied.

**B.    Plaintiff's Motion for Summary Judgment**

Plaintiff moves for summary judgment on his breach of contract claim against

Stavatti and on his Arizona RICO claim against Stavatti, Beskar, and Colvin.  (Doc. 68). The Court will address each argument in turn.

### 1. Whether Colvin was Acting as an Authorized Agent of Stavatti

Plaintiff states that summary judgment is warranted on his breach of contract claim against Stavatti. (Doc. 68 at 4). Stavatti responds that it cannot be held liable for nonpayment of Plaintif's investment under the terms of the promissory note because Colvin acted as a "rogue agent" and forged Beskar's signature on the promissory note. (Doc. 72 at 6).  Stavatti says Plaintiff has failed to and cannot establish that Colvin was "an authorized agent when he orchestrated an unauthorized transaction with an unauthorized facsimile signature of the Company president." (Doc. 72 at 12).  Colvin, in his Response, denies forging Beskar's signature, and says Beskar emailed him the promissory note with Beskar's signature already on it.  (Doc. 74-1 at ¶ 13, Ex. 74-1, Aff. of Brian Colvin). The Court finds that genuine issues of fact preclude summary judgment on Plaintiff's breach of contract claim.

A corporation can be found liable for contracts signed on its behalf by an agent of the corporation. *Bank of Douglas v. Robinson*, 278 P.2d 417, 422 (1954). Liability of course is premised on the individual not only being an agent of the corporation, but also having "actual, implied or apparent authority to sign the particular contract in question." *Id.* The authority to act on behalf of a corporation is only created if the principal of the corporation, either directly, apparently, or by implication, requests the agent to act on his behalf. *Id.*

The Court finds that Plaintiff has not met his burden of showing that summary judgment should be entered in his favor on the breach of contract claim because factual questions remain as to whether Stavatti should be liable under the note.   While Plaintiff asserts that Stavatti and Beskar are liable on the promissory note facilitated by Colvin, Moving Defendants maintain that Colvin was not acting as an authorized agent of Stavatti. Beskar denies that he gave Colvin authority to act on Beskar's or Stavatti's behalf to execute the promissory note and says that Colvin acted, not upon Beskar's permission or

authority, but at his own behest in signing Beskar's name.  (Doc. 72 at 2; *see also* Doc. 72-2 at 111:1–22, Ex. B, Dep. of Chrisopher R.  Beskar ("Beskar Dep.").  Beskar maintains that Colvin was a "rogue" agent who refused to follow proper protocols and procedures for the procurement of new investors. (*Id.* at 116:2: "He was out doing rogue activities.").  Beskar testified during his deposition that he tried to reign in Colvin's behavior by telling him, "Brian you cannot do this. You need to provide us with the information of who these people are, why they're doing this. What the terms are." (*Id.* at 116:22–25).  Beskar says that his signature was forged on the promissory note and that he never sent an email affirming the promissory note between Plaintiff and himself.  (*Id.* at 111:17–21).

Colvin, on the other hand, argues that during the entirety of his dealing with Plaintiff, he was simply following orders from Beskar.  (Doc. 74 at 6).  According to Colvin, Beskar sent him an email that included a promissory note with Beskar's signature. (Doc. 74-1 at 3, Ex. 74-1, Aff. of Brian Colvin). He also points the Court's attention to Beskar's email approving the promissory note between Plaintiff and Beskar.  (*Id.* at 3–4). In fact, Colvin states that he was promoted shortly after he brought Plaintiff to Beskar as a new investor. (*Id.* at 4).

Fraud is a defense to the enforceability of a contract and testimony by Plaintiff, Beskar, and Colvin go the heart of this issue.  Given the significant factual disputes raised by these testimonies, at this juncture, the Court finds summary judgment is inappropriate on Plaintiff's breach of contract claim.

### 2.      RICO violation under Arizona law

Next, Plaintiff pursues summary judgment against Stavatti, Beskar, and Colvin for a RICO violation under Arizona law. (Doc. 68 at 6). Plaintiff says undisputed facts show that he was sold an unregistered security, the promissory note, under a scheme or artifice to defraud.[5]  (*Id.* at 6–7).  Moving Defendants counter that they did not see the promissory

---

[5] Plaintiff also seems to lay some groundwork for the argument that Moving Defendants misled him by stating on their website that they manufacture airplanes and yet have not produced a single airplane.  (Doc. 68 at 13). Beskar admitted that this is not Stavatti's current business model. (Doc. 68-3 at 37: 6–25). He testified that airplane production was Stavatti's old business model and it now exists more as an "intellectual property rights" owner to three airplanes.  (*Id.*)  He said they also upgrade and fix airplanes. (*Id.*)

note nor its terms until well after Plaintiff invested in their company. (Doc. 72 at 3–4). According to Moving Defendants, they might never have seen the promissory note or understood the bounds of the fraud that Colvin had perpetuated on them but for an internal company audit. (*Id.* at 6). Colvin, for his part, asserts that he thought Plaintiff was simply making a private business loan to Moving Defendants. (Doc. 74 at 4). Colvin denies any involvement in a fraud or a scheme to defraud anyone. (*Id.* at 5). Instead, Colvin states that he believed and still believes that he was part of seeking investments for a legitimate aerospace company that modernizes airplanes and airplane parts. (*Id.* at 5–6).

A RICO violation under Arizona law requires the following: (1) a predicate act that satisfies the definition of racketeering under A.R.S. § 13-2301(D)(4); (2) a pattern of racketeering activity under A.R.S. § 13-2314.04 (T)(3)(a); and (3) demonstrate a "reasonably foreseeable injury" that was "proximately caused by the defendant's violation of a predicate RICO act." A.R.S. § 13-2314.04(A); *Rosier v. First Fin. Cap. Corp.*, 889 P.2d 11, 15 (Ariz. Ct. App. 1994). Importantly, racketeering is defined as:

> any act, including any preparatory or completed offense, that is chargeable or indictable under the laws of the state . . . in which the act occurred . . . and that would be punishable by imprisonment for more than one year under the laws of this state . . .. regardless of whether the act is charged or indicted, and the act involves . . . . [a]ny of the [enumerated] acts if committed for financial gain . . . .

A.R.S. § 13-2301(D)(4),(D)(4)(b). The relevant enumerated acts include intentional or reckless fraud in the purchase or sale of securities, intentional or reckless sale of unregistered securities or real property securities, and a scheme or artifice to defraud. A.R.S. § 13-2301(D)(4) (xviii), (xix), (xx). A pattern of racketeering activity requires "[a]t least two acts of racketeering" as enumerated in A.R.S. § 13-2301(D)(4)(b), but that also satisfy the following conditions:

> (i) The last act of racketeering activity that is alleged as the basis of the claim occurred within five years of a prior act of racketeering.
> (ii) The acts of racketeering that are alleged as the basis of the claim were related to each other or to a common organizing principle, including the affairs of an enterprise. Acts of racketeering are related if they have the same or similar purposes,

results, participants, victims or methods of commission or are otherwise interrelated by distinguishing characteristics.

(iii) The acts of racketeering that are alleged as the basis of the claim were continuous or exhibited the threat of being continuous.

A.R.S. § 13-2314.04(T)(3).

Summary Judgment in Plaintiff's favor on its state RICO claim is decidedly inappropriate at this time.[6]  While Plaintiff certainly shapes the allegations in his Motion to conform to the elements of a RICO claim, he does not satisfy the guiding principle the Court must use to decide if summary judgment in his favor is appropriate: that to grant summary judgment, there must be no genuine factual issues that could be resolved in favor of either party by a reasonable juror.  *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586–87 (1986).

In support of his RICO claim, Plaintiff argues that Stavatti, a Wyoming-based corporation with multiple entities, acted as an enterprise when it, Beskar, and Colvin sold him an unregistered security in the form of the promissory note.  (Doc. 68 at 9).  Plaintiff contends Defendants "coordinated a scheme with the purpose of obtaining money" by fraud and that Beskar, that "[a]s the CEO of Stavatti Aerospace, and CEO of the other Stavatti Defendant's, [] singlehandedly created the Stavatti entities and the Stavatti website, which includes false pretenses, representations, promises, or omissions to induce laypeople into investing in Stavatti Aerospace." (*Id.* at 13–14).   Plaintiffs argues that Stavatti, Beskar, and Colvin misrepresented that Stavatti would be able to pay back his promissory note and never informed him that paying back the promissory note was contingent on Stavatti receiving funding for one of its projects from DelMorgan. (*Id.* at 18).

Though Stavatti and Beskar's Response largely fails to address many specific arguments Plaintiff raises in its Motion, Plaintiff has not shown that there is an absence of

---

[6] A party who moves for summary judgment on the ground that the nonmoving party has no evidence, has to affirmatively point the Court to the absence of evidence in the record. *See* Federal Summary Judgment Doctrine: A Critical Analysis, 83 Yale L.J. 745, 750 (1974) (laying out this framework).  Plaintiff has not done so here.

- 11 -

a genuine dispute of material fact that would entitle him to a grant of summary judgment in his favor on the RICO claim. Even though the promissory note is signed, Beskar in his deposition denies signing it, instead placing the blame on Colvin for forging his signature. (Beskar Dep., Doc. 68-3 at 28, 112:7– 3).  Beskar says he did not see the promissory note until Stavatti's accounting firm conducted an internal audit and demanded that Colvin hand over the promissory note.  (*Id.* at 114: 18–25; 115: 3–19).  He testified that to approve an investment of this size, he would normally need approval by the board of directors and he would have sought that for Plaintiff's investment, if Colvin was acting under his purview. (*Id.* at 129:20–25).  Beskar further denies sending an affirming email for the promissory note. (*Id.* at 134:5–8).

Colvin, for his part, states that he acted under the guidance and authority of Beskar at all relevant times.  (Doc. 74 at 5).  At no point, he says, did he believe that Stavatti and Beskar were engaged in fraudulent acts or schemes to defraud.  (*Id.*)  In support of Colvin's contention that he did not know or believe that any information relating to Stavatti or its investments was false or misleading, Colvin says correspondence between himself and Beskar show he was having legitimate communications with Moving Defendants about investments, such as the email he received from Beskar with a promissory note that had Beskar's signature already on it (Doc. 74-1 at 4, Colvin Aff. ¶ 13), and another an email has an attachment with the label "valentino1mill.zip." (Doc. 74-7, Ex. 74-7, Mar. 31, 2022, Email from Colvin to Beskar detailing his work raising capital).  Despite his averments, Colvin does not identify where in the record Beskar's email to him is located, nor does he extrapolate on the contents of the zip file that purports to detail Colvin's work.  Colvin also states that he informed Beskar of his every move related to Plaintiff at weekly Wednesday meetings.  (*Id.* at ¶ 29).  He specifically argues that Stavatti was engaged in a legitimate fundraising effort for an internal program called the Super Fulcrum program. (Doc. 74 at 5).  The Super Fulcrum program would have upgraded certain fighter jets for use in an air defense capacity.  (*Id.*; *see also* Doc. 74-3 at 2, Ex. 74-3, Internal Stavatti Document showcasing fundraising plan for Super Fulcrum project).  Colvin contends that the only

reason this program never came to fruition is because of the war in Ukraine and investors getting cold feet because of it. (Doc. 74 at 4).

Though plenty can be questioned regarding Colvin's evidence, in all, summary judgment on Plaintiff's state RICO claim is inappropriate here because too many material facts are in dispute that could be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Disputes include whether Colvin was acting at Beskar's behest or of his own accord and whether Stavatti was a legitimate business or simply a scheme or artifice to defraud investors. Viewing all the evidence in the light most favorable to Represented Defendnats and Colvin, the Court finds that Plaintiff's Motion for Summary Judgment is properly denied as to the state RICO claim.

Accordingly,

**IT IS ORDERED** that Stavatti Aerospace Limited's, Christopher Beskar's, John Simon's, Jean Simon's, William Mcewen's, Patricia Mcewen's, Rudy Chacon's, and Jane Doe Chacon's Motion for Summary Judgment (Doc. 63) is **denied.**

**IT IS FURTHER ORDERED** that Stavatti Aerospace Limited's, Christopher Beskar's, John Simon's, Jean Simon's, William Mcewen's, Patricia Mcewen's, Rudy Chacon's, and Jane Doe Chacon's Motion to Strike (Doc. 66) is **denied.**

**IT IS FURTHER ORDERED** that Plaintiff Valentino Dimitrov's Response to the Motion to Strike (Doc. 67) is **moot.**

**IT IS FURTHER ORDERED** that Plaintiff Valentino Dimitrov's Motion for Summary Judgment (Doc. 68) is **denied.**

**IT IS FINALLY ORDERED** the parties shall file a Notice of Readiness for a Pretrial Conference within ten (10) days of this Order.  Upon joint request, the parties may also seek a request for a referral to a Magistrate Judge for a settlement conference.

Dated this 30th day of March, 2026.

Honorable Diane J. Humetewa
United States District Judge

- 13 -